2021 UT 40

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LARRY BOYNTON, individually and on behalf of the heirs of
BARBARA BOYNTON,
*Appellee/Cross-Appellant,*

*v.*

KENNECOTT UTAH COPPER, LLC,[1]
*Appellant/Cross-Appellee*

No. 20190259
Heard November 13, 2020
Filed August 5, 2021.

On Interlocutory Appeal

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 160902693

Attorneys:

Troy L. Booher, Beth E. Kennedy, Dick J. Baldwin, Salt Lake City,
and Richard I. Nemeroff, Barrett B. Naman, Park City, for
appellee/cross-appellant Larry Boynton

Rick L. Rose, Kristine M. Larsen, Blake M. Biddulph, Salt Lake
City, for appellant/cross-appellee Kennecott Utah Copper, LLC

Stephen K. Christiansen, Bret W. Reich, Salt Lake City, for cross-
appellee PacifiCorp

Tracy H. Fowler, Stewart O. Peay, Kristen Overton, Salt Lake City,
for cross-appellees Phillips 66 Company and ConocoPhillips
Company

---

[1] Other cross-appellees are Phillips 66 Company,
ConocoPhillips Company, and PacifiCorp.

JUSTICE HIMONAS authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE PEARCE, and JUSTICE PETERSEN joined.

———————

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶1    Larry Boynton was exposed to asbestos while working at several job sites during the 1960s and 1970s. His wife, Barbara Boynton, was later diagnosed with mesothelioma. She died of the disease shortly after her diagnosis. Mr. Boynton sued the job site operators for indirectly exposing his wife to asbestos dust. The district court granted summary judgment to two of the operators on the grounds that they had no duty to prevent "take-home exposure" to asbestos dust. We reverse and take this opportunity to explain why job site operators—"premises operators" in the vernacular of the law—owe a duty of care to a worker's co-habitants with respect to take-home exposure to asbestos. We also hold that one of the premises operators retained control over its contractor, and we take this opportunity to flesh out the retained control exception to the general rule of employer nonliability for the acts of their contractors.

## BACKGROUND

### I. THE BOYNTONS' EXPOSURE TO ASBESTOS

¶2    Barbara and Larry Boynton married in September 1962.[2] During their marriage, Larry worked at numerous job sites where he was exposed to asbestos.

¶3    Larry alleges—and for the purposes of summary judgment and this appeal, we assume—that Barbara was exposed to asbestos dust he carried home from work and that this exposure brought on her mesothelioma and resulting death. More specifically, Larry alleges that he would drive home from work, incidentally leaving asbestos dust in the Boyntons' car. Upon arrival, he would enter the home wearing his work clothes,

———————————————————————

[2] To promote readability, we largely refer to the Boyntons by their first names through the remainder of our opinion. We intend no disrespect by avoiding the use of their prefixes and surname.

spreading asbestos dust in the process. Barbara would then launder Larry's clothes, shaking the dust out before washing. Afterwards, she would sweep the laundry room to clean the accumulated asbestos dust. Through this process, Barbara was exposed to asbestos dust in "great quantities." After nearly fifty-four years of marriage, Barbara was diagnosed with malignant mesothelioma on February 4, 2016, and she died from it on February 27, 2016.

## II. LARRY'S WORK HISTORY

¶4 Larry worked at no fewer than six job sites during the 1960s and 1970s. He alleges that the "cutting, chipping, mixing, sanding, sawing, scraping and sweeping . . . by [him] and . . . around [him] [of] asbestos-containing products exposed him to great quantities of asbestos." Three job sites are relevant to this appeal.

¶5 From 1961 to 1964, Larry worked as a laborer for Kennecott Utah Copper, LCC ("Kennecott") at Kennecott's smelter. His duties included cleaning up discarded pipe insulation that may have contained asbestos. Beginning in 1963, Larry worked as an electrician for Wasatch Electric (an independent contractor). He continued to work at Kennecott's smelter, albeit as an employee for Wasatch Electric, for another two years. During that time, Kennecott's employees scraped, sawed, and swept asbestos insulation and mixed asbestos cement. Each of these activities occurred near Larry—who was allegedly less than twenty feet away—and released asbestos dust into the air. All these activities caused asbestos dust to settle on Larry's clothes, dust that Barbara is alleged to have inhaled during the Boynton's marriage. Kennecott never warned Larry about the dangers of asbestos and never provided laundry services that would have allowed him to change his clothes before returning home to Barbara.

¶6 In 1973, Larry worked as a construction electrician for Jelco-Jacobsen, a general contractor at PacifiCorp's[3] Huntington

_____

[3] The entity that built the power station (and performed the allegedly tortious actions in this case) was Utah Power & Light. PacifiCorp is Utah Power & Light's undisputed successor-in-interest. For readability, we refer to Utah Power & Light as PacifiCorp.

Canyon Power Plant. PacifiCorp had entered a contract with Jelco-Jacobsen to build the power station. While Larry did electrical work, employees from Mountain States Insulation (a subcontractor) worked with asbestos pipe insulation, allegedly creating asbestos dust in so doing. Again, Larry worked within twenty feet of these asbestos-generating activities. And like Kennecott (and later ConocoPhillips), neither PacifiCorp nor Jelco-Jacobsen warned him about the dangers of asbestos, monitored or attempted to limit his asbestos exposure, or provided laundry services that would have allowed him to change before driving home. As a result, Larry alleges that PacifiCorp and Jelco-Jacobsen exposed him to asbestos that he carried home to Barbara, eventually causing her mesothelioma and premature death.

¶7   And from 1976 to 1978, Larry worked as an electrician for L.E. Myers, an independent contractor, at Phillips 66/ConocoPhillips's ("Conoco") oil refinery. Conoco employees allegedly removed asbestos pipe insulation and let it fall to the ground. Conoco employees would later sweep the discarded insulation during cleanup. Both the pipe removal and the cleanup allegedly generated asbestos dust. Larry alleges that he worked within twenty feet of the Conoco employees. He further alleges that the asbestos dust would settle on his clothes and that Barbara would inhale that dust when laundering his clothes. The result, again, was to cause Barbara to develop mesothelioma. Conoco, like the others, did not warn Larry about the dangers of asbestos, did not monitor or attempt to limit asbestos levels at the refinery, and did not provide laundry services that would have prevented him from bringing his contaminated clothes home.

## III. THE PACIFICORP CONTRACT

¶8   PacifiCorp did not use its own employees to handle the asbestos materials used in the construction of the Huntington Plant. Instead, it contracted with Jelco-Jacobsen to build the plant. The contract required Jelco-Jacobsen to use several asbestos-containing materials, including asbestos insulation and asbestos cement. Only PacifiCorp could approve substitutions to materials that did not contain asbestos. The contract also provided detailed specifications about the project. Some of these specifications prescribed how Jelco-Jacobsen would handle the asbestos-containing materials, such as specifications on how to mix and apply the asbestos cement. And PacifiCorp retained a general responsibility over safety. For example, PacifiCorp had a general responsibility to inspect the project's materials and Jelco-

Jacobsen's methods. If it found any safety issues, PacifiCorp was able to unilaterally direct changes in the materials or order Jelco-Jacobsen to stop unsafe work practices. Further, PacifiCorp was obligated to direct Jelco-Jacobsen in implementing adequate control measures to prevent harmful dust levels.

## IV. PROCEDURAL HISTORY

¶9 Larry filed suit against Kennecott, PacifiCorp, and Conoco (at times, the "premises operators") for strict premises liability and negligence. The premises operators each moved for summary judgment, arguing they did not owe a duty of care to Barbara. The district court denied Kennecott's motion, finding a disputed issue of fact because Larry alleged affirmative acts exposing him to asbestos, thus inviting the inquiry into whether Kennecott owed a legal duty to Barbara. But the district court granted PacifiCorp and Conoco's motions, determining that PacifiCorp and Conoco did not engage in any misfeasance that would have created a duty to Barbara. Moreover, the district court determined that PacifiCorp and Conoco did not interfere with the work of their general contractors.

¶10 This case comes before us on interlocutory appeal. We exercise jurisdiction under rule 5 of the Utah Rules of Appellate Procedure.

## STANDARD OF REVIEW

¶11 On interlocutory appeal, we review grants and denials of summary judgment for correctness. *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 19, 116 P.3d 323. "Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Herland v. Izatt*, 2015 UT 30, ¶ 9, 345 P.3d 661. We view the facts and indulge the reasonable inferences in the light most favorable to Larry, the nonmoving party. *See id.*

## ANALYSIS

¶12 Following Barbara's death, Larry sought legal relief against the premises operators, among others. Against Kennecott and Conoco, Larry asserts strict premises liability and direct-liability negligence; he bases these claims on Barbara's take-home exposure to asbestos dust generated by the premises operators' employees when he worked for Kennecott at its smelter, when he was an employee of the independent contractor at the smelter, and when he was an employee of the independent contractor at Conoco's premises. On summary judgment before the district

court, Kennecott and Conoco argued they owed no duty of care to Barbara. Conoco was successful in its argument; Kennecott wasn't. With respect to these two defendants, the sole issue before us in this interlocutory appeal is whether they owed Barbara a duty of care.

¶13 Against PacifiCorp, Larry asserts strict premises liability and direct-liability negligence based on PacifiCorp's decision to use asbestos, and vicarious-liability negligence based on PacifiCorp's retained control over Jelco-Jacobsen, which was required by contract to use asbestos insulation at PacifiCorp's direction. PacifiCorp argued below on summary judgment that it owed no duty of care to Barbara. On appeal, Larry has not adequately briefed his direct-liability negligence claim against PacifiCorp. And PacifiCorp did not challenge below, and has not challenged on appeal, Larry's claim that Jelco-Jacobsen owed a duty to Barbara. Instead, PacifiCorp argues that it did not "retain control" over Jelco-Jacobsen and therefore did not assume Jelco-Jacobsen's liability under the common-law rule that parties are not liable for the acts of their independent contractors.

¶14 We affirm in part, reverse in part, and remand for proceedings consistent with this opinion. We hold that both Kennecott and Conoco owed a duty of care to Barbara to prevent her take-home exposure to asbestos. To this end, both Kennecott and Conoco took affirmative acts that introduced asbestos into the workplace, acts that created a foreseeable risk of harm to the co-habitants of a worker exposed to asbestos dust. In addition, we discern no reason counselling against the imposition of a duty of care in this setting. We further hold that a genuine issue of material fact exists as to whether PacifiCorp actively participated in the relevant work of its contractor, Jelco-Jacobsen. Through the relevant contract, PacifiCorp required Jelco-Jacobsen to use asbestos materials, specified how Jelco-Jacobsen must handle the asbestos materials, and took responsibility for a dust removal program. Because those contractual provisions are enough to show that PacifiCorp retained some control over Jelco-Jacobsen, there is a genuine issue of fact about whether that retained control was the injury-causing activity in this case.

## I. DUTY OF CARE

### A. *Asbestos Litigation*

¶15 We are asked to decide in this case whether premises operators owe a duty to employees' co-habitants for "take-home

6

exposure" to asbestos.[4] And while this issue is a matter of first impression for us, we are far from the first court to consider it. Asbestos litigation, a "mess that has become the longest running mass tort," Helen E. Freedman, *Selected Ethical Issues in Asbestos Litigation*, 37 SW. U. L. REV. 511, 511 (2008), has evolved since the bankruptcy of asbestos manufacturers. For decades, claimants, such as employees and independent contractors, have sued premises operators for exposing them to asbestos. *See, e.g.*, Mark A. Behrens, *What's New in Asbestos Litigation?*, 28 REV. LITIG. 501, 502–03 (2009). More recently, co-habitants have been suing premises operators for take-home exposure to asbestos. *See, e.g.*, *Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255 (Del. 2018); *CSX Transp., Inc. v. Williams*, 608 S.E.2d 208 (Ga. 2005).

¶16 With respect to these take-home exposure lawsuits, courts have split, often because of how they have analyzed the question of whether the premises operators owed a duty of care to the injured party. Behrens, *supra*, at 546–48 (explaining how states have arrived at different conclusions depending on whether their duty analysis keys in on party relationships or on foreseeability of the risk); *see also Kesner v. Super. Ct.*, 384 P.3d 283, 302–05 (Cal. 2016) (explaining that states that reject negligence and premises liability for take-home asbestos exposure have either focused their

---

[4] Other courts have addressed "household exposure," "spousal exposure," and "clothing exposure" to refer to similar exposure. *See, e.g.*, *Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1259 n.1 (Del. 2018) (explaining some existing terminology). Sometimes these terms apply to different degrees of exposure— "clothing exposure," for example, may describe those who come into contact with an employee's clothing following asbestos exposure. *See CSX Transp., Inc. v. Williams*, 608 S.E.2d 208, 209–10 (Ga. 2005) (describing "clothing exposure" as exposure experienced by "all who might come into contact with an employee or an employee's clothing outside the workplace"). In this case, we address specifically "take-home exposure." We use this term to refer to the situation whereby a co-habitant (including but not limited to family members) is exposed to asbestos brought home from work by another co-habitant. "Take-home exposure" at least includes asbestos brought home on work clothing and presumably would include asbestos brought home via other personal effects (e.g., a toolbox or lunch box).

duty analysis on special relationships or found the danger not yet foreseeable). Courts that have focused on the relationship between parties when defining duties of care have rejected liability for exposure beyond the workplace. *See CSX Transp.*, 608 S.E.2d at 210; *In re Certified Question from Fourteenth Dist. Ct. App. of Tex. (Miller v. Ford Motor Co.)*, 740 N.W.2d 206, 214–15 (Mich. 2007). For those courts, the "relationship" is, essentially, too attenuated for a legal duty—someone like Barbara has little, if any, direct relationship with the premises operators. Conversely, courts that have focused on the foreseeability of injury in the duty sphere have often found liability for take-home exposure. *See* Behrens, *supra*, at 547–48 (noting that in "nearly every . . . instance where courts have recognized a duty of care in a take home exposure case, the foreseeability of risk was the primary, if not only, consideration in the courts' duty analyses"); *Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1148 (N.J. 2006); *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 374 (Tenn. 2008). But filing a claim in a foreseeability-focused jurisdiction doesn't guarantee relief; indeed, some of these jurisdictions have rejected liability when the suit involves exposure prior to when the employers might reasonably have foreseen the risks from take-home exposure to asbestos. *E.g.*, *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 444–45 (6th Cir. 2009) (finding that plaintiff failed to show that defendants knew or should have known of "bystander asbestos exposure" from 1937 to 1963); *Miller*, 740 N.W.2d at 218 (determining that the dangers of take-home exposure were, "in all likelihood, not foreseeable" from 1954 to 1965); *Alcoa, Inc. v. Behringer*, 235 S.W.3d 456, 462 (Tex. App. 2007) (finding that the dangers of take-home exposure were "neither known nor reasonably foreseeable . . . in the 1950s"). And finally, some jurisdictions, such as Delaware, determine duty largely according to the act-omission distinction and have found liability for take-home exposure whenever employers engaged in misfeasance. *Ramsey*, 189 A.3d at 1260, 1285 (Del. 2018).

### B. *Utah Standard for Establishing a Duty of Care*

¶17 "To assert a successful negligence claim, a plaintiff must establish that (1) defendant owed plaintiff a duty of care, (2) defendant breached that duty, and that (3) the breach was the proximate cause of (4) plaintiff's injuries or damages." *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5 n.2, 275 P.3d 228. To establish a duty of care, Utah courts ask

(1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations.

*Id.* ¶ 5 (citations omitted) (internal quotation marks omitted). "The determination of whether a legal duty exists . . . is a purely legal question . . . ." *Herland v. Izatt*, 2015 UT 30, ¶ 9, 345 P.3d 661 (first alteration in original) (quoting *Yazd v. Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283).

¶18 The seminal cases in Utah regarding the determination of whether a duty exists are *Jeffs* and *Herland*. Under *Jeffs*, we consider the five factors listed above. *Supra* ¶ 17. *Jeffs* described the first two factors as "plus" factors—generally, one party will have a duty to the other if it makes an affirmative act or if the parties have a special legal relationship. 2012 UT 11, ¶ 5. The remaining three factors were described as "minus" factors that might counsel against creating a legal duty, even if there's an affirmative act or legal relationship. *Id.*

¶19 *Jeffs* suggested that not all factors were created equal, with our analysis focusing primarily on whether the defendant made an affirmative act. To this end, we noted that "[t]he long-recognized distinction between acts and omissions—or misfeasance and nonfeasance—makes a critical difference and is perhaps the most fundamental factor courts consider when evaluating duty." *Id.* ¶ 7. We further noted that "a special relationship is not typically required to sustain a duty of care to those who could foreseeably be injured by the defendant's affirmative acts." *Id.* ¶ 10. And we also provided that, once we determine that a party has engaged in affirmative conduct, we will typically only "carve out an exception" that eliminates the duty "in categories of cases implicating unique policy concerns." *Id.* ¶ 21.

¶20 We modified the relationship among the factors in *Herland*. There, we interpreted *Jeffs* to "identif[y] five key factors that inform our analysis of whether a duty of care exists." *Herland*, UT 2015 30, ¶ 10. We discarded any discussion of the factors as necessarily "plus" or "minus" factors. Instead, we emphasized that "[s]ome factors are featured heavily in certain types of cases,

while other factors play a less important, or different, role." *Id.* ¶ 13 (quoting *Jeffs,* 2012 UT 11, ¶ 5).

¶21 *Herland* demonstrates how the foreseeability factor can function as the primary "plus" factor. *Id.* ¶ 20 (declaring that "the foreseeability factor weighs in favor of establishing a duty"). In that case, we started our duty analysis with the foreseeability factor, *id.* ¶ 14, and implied that the foreseeability factor played the primary role in determining the case, *id.* ¶¶ 10, 33, 40 (declaring a duty for those who supply a gun to others who "are likely to use the gun in a manner that creates a foreseeable risk of injury to themselves or third parties"). In essence, *Herland* clarifies that we do not treat all five factors as equally important and that, like the distinction between acts and omissions, foreseeability plays a particularly important role in our analysis.

### C.  Analysis of Duties of Care at a Categorical Level

¶22 We consider whether a duty exists for a general category of cases versus on a case-by-case basis: "Duty must be determined as a matter of law and on a categorical basis for a given class of tort claims" and "should be articulated in relatively clear, categorical, bright-line rules of law applicable to a general class of cases." *Jeffs,* 2012 UT 11, ¶ 23 (citations omitted) (internal quotation marks omitted). In *Jeffs,* for example, this court did not consider whether a duty existed specifically for a nurse prescribing the exact combination of pharmaceuticals that allegedly caused the patient to turn violent and kill his wife. *Id.* ¶¶ 2, 23. Rather, we considered "healthcare providers as a class, negligent prescription of medication in general, and the full range of injuries that could result in this class of cases." *Id.* ¶ 23.

¶23 Likewise, we do not decide in this case whether Kennecott, PacifiCorp, and Conoco specifically owe a duty to Barbara for take-home exposure to asbestos that allegedly caused her mesothelioma. Instead, to determine whether a duty exists, we consider premises operators,[5] take-home exposure to asbestos,[6] all

---

[5] As used in this opinion, "premises operator" refers to any person or entity with some degree of control over a particular job site or any subsection of such a larger job site. That category will typically include the owner of a job site, any renter of a job site, and any person or entity who controls work activity on a job site. The category will therefore sometimes cover employers,

(continued . . .)

the resulting injuries, and—because in this case, it matters for the general foreseeability analysis—the relevant time period at issue (from 1961 onwards). The litigants will have the opportunity to address the facts of their specific cases when they argue about whether a breach of duty occurred and whether it caused the injury. For example, the premises operators here could later argue that they exposed Larry to only a medically insignificant amount of asbestos and, therefore, did not cause Barbara's mesothelioma.

¶24 But we do not assess this case entirely at the categorical level. This matter involves two independent duty-related questions. Utah courts have never established that a duty exists for premises operators to exercise reasonable care with respect to take-home exposure to asbestos. So, applying the appropriate

_____

(continued . . .)

contractors, and subcontractors. The primary limiting consideration is whether the person or entity has even a limited amount of control. Such control shows that the premises operator could have taken steps that would have prevented the take-home exposure to asbestos. Whether the premises operator's failure to take those steps actually caused the take-home exposure to asbestos is a question of causation—not duty.

[6] It is certainly an art, not a science, to define the exact scope of generality at which to assess the allegedly tortious activity. *See, e.g., Herland*, 2015 UT 30, ¶¶ 15–16 (defining the category as "gun owners who are negligent in supplying their guns to others" but acknowledging a similar analysis for "owners of dangerous weapons" in general). The idea is to create a rule that will cover "an occurrence of the same general nature." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993) (quoting *Rees v. Albertson's, Inc.*, 587 P.2d 130, 133 (Utah 1978)). In *Jeffs*, the court therefore considered the "negligent prescription of medication in general" and not just a particular subset of medications, even though the analysis applied primarily to medications with potential psychoactive side effects. 2012 UT 11, ¶ 23. Here, we analyze only asbestos exposure because some parts of the analysis may differ from other toxic materials that can be carried on clothes, in vehicles, or otherwise from a job site to a home. Other toxic materials, for example, may have had known dangerous effects either earlier or later than asbestos.

analytic framework, we first must consider whether a duty of care exists for that category of cases. But this case reaches us after the district court ruled on a motion for summary judgment. Thus, if we determine that a duty exists, we must also determine—after allowing for all reasonable inferences in favor of the nonmoving party—whether this case falls within the ambit of the duty of care. That is the second question.

¶25 In our duty of care cases, we have not always clearly distinguished between these two questions. For that reason, it may seem confusing why we sometimes analyze case-specific facts in cases about whether a categorical duty of care exists.[7] But a careful reading of our cases shows that we only analyze case-specific facts when we ask whether a case falls within the relevant category. For example, in *Herland*, we determined whether a "duty of care [existed] in th[e] general category of cases . . . . of gun owners who are negligent in supplying their guns to others who then injure themselves or third parties." 2015 UT 30, ¶¶ 11, 15. We ruled that a duty of care was violated whenever the defendant "(1) directly suppl[ied] or hand[ed] a gun to another, (2) plac[ed] the gun within reach of another, or (3) consent[ed] (either explicitly or implicitly) to the use of the gun by another." *Id.* ¶ 38. We then separately resolved that case's motion for summary judgment, asking "whether the specific factual scenarios alleged by the parties fit any of these categories." *Id.*

*D. Duty Analysis*

1. Affirmative Act or Omission

¶26 The first factor turns on the common distinction between acts and omissions:

---

[7] We have oscillated most often when discussing the first factor—"whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission." *Jeffs*, 2012 UT 11, ¶ 5. Because a duty of care typically exists only if there's an "affirmative act," we usually define a "duty of care" according to the types of action that trigger it. *See, e.g., Herland*, 2015 UT 30, ¶ 38 (defining acts that trigger the duty of care for negligently supplying a gun to another). So, in the same section of an opinion, we might also explain that the particular facts were the types of actions that create liability.

> Acts of misfeasance, or active misconduct working positive injury to others, typically carry a duty of care. Nonfeasance—passive inaction, a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the defendant—by contrast, generally implicates a duty only in cases of special legal relationships.

*Jeffs*, 2012 UT 11, ¶ 7 (internal quotation marks omitted) (quoting Francis H. Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability*, 56 U. PA. L. REV. 217, 219 (1908)). We have found that people make "affirmative acts" when they prescribe medication, *id.* ¶ 18, provide therapy, *Mower v. Baird*, 2018 UT 29, ¶ 21, 422 P.3d 837, *as corrected* (July 11, 2018), place inmates in a work-release program, *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 34, 356 P.3d 1172, or supply someone with a gun, *Herland*, 2015 UT 30, ¶ 38. We have not found an affirmative act when a party *fails* to perform a background check or *fails* to train and supervise employees. *Graves v. N.E. Servs., Inc.*, 2015 UT 28, ¶ 27, 345 P.3d 619. In *Graves*, the party had only undertaken one act—hiring the employee—and only had a duty for that particular act, "not for a broader duty to undertake additional measures." *Id.* ¶ 29. "The line between acts and omissions is sometimes subtle." *Scott*, 2015 UT 64, ¶ 35. Ultimately, however, we follow the lead of Justice Cardozo in asking "whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good." *Id.* (quoting *H.R. Moch Co. v. Rensselaer Water Co.*, 159 N.E. 896, 898 (N.Y. 1928) (Cardozo, C.J.)) (internal quotation marks omitted).

¶27 For the purposes of determining whether a duty of care exists in take-home exposure cases, we conclude that premises operators act affirmatively whenever they have "launched [the] instrument of harm" by directing, requiring, or otherwise causing workers to come in contact with asbestos. Though we cannot predict every situation that will fall within this domain, we are comfortable saying that a premises operator will have engaged in "misfeasance" (as that term is understood in the duty analysis) at least when they (1) instruct workers to handle asbestos, (2) have nearby workers handle asbestos, (3) place asbestos on the premises, (4) send employees to a workspace containing asbestos, or (5) purchase a workspace containing asbestos and invite workers onto it. These categories do not include instances where a premises operator merely fails to prevent an employee from

coming into contact with asbestos, like if an employer fails to prevent the spread of asbestos from an adjacent worksite.

¶28 For the purpose of resolving the motion for summary judgment,[8] we find that Larry has sufficiently established misfeasance by Kennecott and Conoco, which triggers a duty of care.[9] Larry came into contact with asbestos dust because he and those around him cut, chipped, mixed, sanded, sawed, scrapped, and swept products containing asbestos. When Larry worked at Kennecott, he and other employees released asbestos into the air by scrapping old insulation, sweeping fallen asbestos, sawing asbestos insulation, and mixing asbestos cement, allegedly contaminating Larry's clothing. And when Larry worked at Conoco, he was allegedly exposed to asbestos when other employees removed asbestos pipe insulation, let it fall to the ground, and then swept it up, again allegedly contaminating his work clothes.[10] Both Kennecott and Conoco therefore allegedly directed Larry and/or nearby employees to handle asbestos. In doing so, each defendant affirmatively "launched [the] instrument of harm" by exposing Larry to the asbestos dust. *See supra* ¶ 27 (defining the duty of care to include instances when premises operators direct a worker or someone nearby them to handle asbestos). Larry doesn't merely allege that the defendants failed to

---

[8] Again, we reiterate that the motion for summary judgment presents a distinct legal question. *See supra* ¶ 24. We only discuss the matter here because we hold that there is a duty of care and the extent of that duty is ultimately limited by whether a defendant committed an act necessary to trigger that liability.

[9] As we explain later, Larry doesn't really argue on appeal that PacifiCorp was directly liable to him. *Infra* ¶ 48. Instead, Larry argues that PacifiCorp retained control over his employer, Jelco-Jacobsen, and therefore assumed Jelco-Jacobsen's liability. And PacifiCorp doesn't presently dispute (and did not dispute in its original motion for summary judgment) that Jelco-Jacobsen was directly liable to Larry.

[10] We do not decide now whether affirmative acts actually occurred in this case—that's a decision for the factfinder. *Herland*, 2015 UT 30, ¶ 37. We only decide that Larry's alleged activities were indeed "affirmative acts" sufficient to survive summary judgment.

protect him and "refus[ed] to become an instrument for good." In *Herland*, we determined that someone engages in an affirmative act when they supply an impaired person with a gun. 2015 UT 30, ¶ 38. We said that "[p]lacing a gun within reach of an intoxicated individual by leaving it on a counter top or opening a safe and consenting to his or her use of a weapon certainly constitutes an overt act, not an omission." *Id.* By creating the initial danger — causing an impaired person to have access to a gun — the gun owner had committed an "affirmative act" and wasn't merely a passive bystander. Likewise, the defendants in this case created the initial danger by causing Larry to come into contact with asbestos.

### 2. Legal Relationship of the Parties

¶29 Special relationships arise when one party assumes responsibility for the safety of another or their opportunities for self-protection. *Jeffs*, 2012 UT 11, ¶ 8. For example, innkeepers, guardians, and common carriers typically have special relationships with those in their care. *Id.* But a "special relationship is not typically required to sustain a duty of care to those who could foreseeably be injured by the defendant's affirmative acts." *Id.* ¶ 10. Rather, "an omission or failure to act can generally give rise to liability only in the presence of some external circumstance — a special relationship." *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 10, 125 P.3d 906, *overruled on other grounds by Cope v. Utah Valley State Coll.*, 2014 UT 53, 342 P.3d 243; *see also Jeffs*, 2012 UT 11, ¶ 9 (explaining that if an affirmative act has occurred, a special legal relationship creates an additional "duty-enhancing, 'plus' factor"); *Mower*, 2018 UT 29, ¶ 20 n.6 (explaining that a special relationship might also create an additional "plus" factor that offsets "strong 'minus' factors").

¶30 Larry alleges that the defendants' actions caused an injury to a third party — Barbara. He doesn't argue that a special legal relationship exists between the defendants and Barbara. But because the defendants engaged in affirmative "misfeasance," Larry doesn't need to establish a special legal relationship in order to establish a duty of care.

### 3. Foreseeability of the Injury

¶31 Foreseeability "relates to 'the general relationship between the alleged tortfeasor and the victim' and 'the general foreseeability' of harm." *Jeffs*, 2012 UT 11, ¶ 25 (quoting *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 20, 215 P.3d 152).

"The appropriate foreseeability question for duty analysis is whether a category of cases includes individual cases in which the likelihood of some type of harm is sufficiently high that a reasonable person could anticipate a general risk of injury to others." *Id.* ¶ 27.

¶32 We have found certain injuries foreseeable when the defendant acts affirmatively towards one party and thereby injures another. In *Jeffs*, we found it foreseeable that negligently prescribing medications to a patient might result in the patient then injuring someone else in situations where the medications cause a psychotic reaction. *Id.* ¶¶ 24–28. In *Mower*, we found it foreseeable that "therapists who carelessly provide therapy to a minor child patient for potential sex abuse [might] injure[] the nonpatient parent through false allegations or memories of sexual abuse." 2018 UT 29, ¶ 25. And in *Herland*, we found it foreseeable that giving a weapon to an intoxicated individual might create a "risk of harm to others." 2015 UT 30, ¶ 16.

¶33 The relevant category here is premises operators who direct, require, or otherwise cause workers to come in contact with asbestos. "[T]he foreseeability question is whether there are circumstances within that category in which [the premises operator] could foresee injury." *Jeffs*, 2012 UT 11, ¶ 27. The circumstances within the category, of course, might differ from the circumstances of the actual case. *See Mower*, 2018 UT 29, ¶ 25. And we consider "the full range of injuries that could result in this class of cases." *Jeffs*, 2012 UT 11, ¶ 23. The employer or premises operator need not foresee the "specific *sequence* of harm." *Herland*, 2015 UT 30, ¶ 17. If the particular sequence was highly unlikely, a court should consider that lack of foreseeability as relevant to the later proximate cause analysis rather than to the duty analysis. *See id.* ¶ 14.

¶34 We must remember that we analyze a category of cases—in this case, premises operators who direct, require, or otherwise cause workers to come in contact with asbestos. Foreseeability will counsel in favor of finding a duty of care if any circumstances within that category would have included a foreseeable harm. *See supra* ¶ 33 (quoting *Jeffs*, 2012 UT 11, ¶ 27). The more specific question—whether the asbestos exposure here could have foreseeably caused harm to Barbara—may be addressed when the lower court considers proximate cause.

¶35 There are circumstances in which premises operators would foresee injury from take-home exposure to asbestos during the relevant time period. Larry started working for Kennecott in 1961. He submitted an expert affidavit from Dr. Richard Lemen explaining the "well-recognized" concerns about asbestos based on publications from that time. Dr. Lemen explained that occupational medicine has understood the risk of "take-home exposure" since at least the eighteenth century. In 1713, Bernardino Ramazzini—often described as the "father of occupational medicine"—described how laundresses may suffer from "clothes exposure" when they "wash bed-linen and underclothes stained with a thousand kinds of filth . . . they inhale by the mouth and nose a mixture of harmful vapors of all sorts." Dr. Lemen also listed numerous medical and government sources from the early twentieth century describing the dangers of workers transmitting various poisons on work clothes. At least one study that he listed, from 1965, explicitly described the risks from take-home exposure to asbestos. For that reason, the risk from asbestos was unambiguously foreseeable at least as early as 1965—prior to the time that Larry worked at the Conoco and PacifiCorp locations, and during the end of Larry's time working at Kennecott's smelter.

¶36 Even for the years prior to 1965, there was substantial scientific evidence suggesting that injury to third parties from take-home exposure to asbestos was sufficiently foreseeable for purposes of our duty analysis.[11] In this regard, Dr. Lemen presented widespread evidence—from the Industrial Health Foundation, the National Safety Council, the American Chemical Society, the American Petroleum Institution, and federal and state laws—showing that people knew about the toxicity of asbestos

---

[11] "In pursuing this inquiry, it is well to remember that 'foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' One may be held accountable for creating even 'the risk of a slight possibility of injury if a reasonably prudent [person] would not do so.'" *Bigbee v. Pac. Tel. & Tel. Co.*, 665 P.2d 947, 952 (Cal. 1983) (alterations in original) (citations omitted).

since at least the 1930s. In their 1898 report, for example, the Women Inspector of Factories declared that the "evil effects of asbestos dust have . . . been found to be injurious as might have been expected." By 1910, Canada listed asbestos-related maladies in its compilation of industrial diseases. In 1930, a report suggested methods to suppress asbestos dust to prevent lung diseases in workers. These are mere examples of an early twentieth century consensus regarding asbestos's toxicity. And, as Dr. Lemen explained, another publication from the Industrial Hygiene Foundation in 1960 had already detailed the risk of spreading asbestos contamination beyond those who came in direct contact with it—in that instance, to everyone in the area immediately surrounding factories with asbestos. Even if studies had yet to formally measure effects from take-home exposure to asbestos, two facts are hard to contradict: First, premises operators had reason to know about take-home exposure to toxic materials. Second, premises operators had reason to know about the toxicity of asbestos. The lack of a formal, specific study of asbestos until 1965 doesn't contradict that premises operators should reasonably know about the dangers of take-home exposure for all times relevant to this matter.

¶37 And beyond the scientific evidence, we think common sense suggests that injury was foreseeable. Courts across the country agree: The California Supreme Court noted "[i]t is a matter of common experience and knowledge that dust or other substances may be carried from place to place on one's clothing or person, as anyone who has cleaned an attic or spent time in a smoky room can attest." *Kesner*, 384 P.3d at 292. And the New Jersey Supreme Court shared the same perspective:

> It requires no leap of imagination to presume that [even] during the decades of the 1940's, 50's, [and] 60's, . . . [a plaintiff or] his spouse would be handling his clothes in the normal and expected process of laundering them so that the garments could be worn to work again. [The plaintiff's] soiled work clothing had to be laundered and [defendant], as one of the sites at which [the plaintiff] worked, should have foreseen that whoever performed that task would come into contact with the asbestos that infiltrated his clothing while he performed his contracted tasks.

*Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1149 (N.J. 2006); *see also id.* (finding notice of risk from take-home exposure to asbestos

dust as early as 1937); *e.g. Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 812 (Va. 2018) (finding a duty to prevent take-home risk to asbestos as early as 1942 partially because "[t]he concept of a mobile hazard that leaves a premises is not new . . . and asbestos that predictably leaves the property is not unlike livestock or any other hazard posing a risk of harm to persons outside the premises"). We similarly find the risks from asbestos—a known toxic material that, at least in some circumstances, travels as a visible dust on clothes—a matter of common knowledge.

¶38 In response, Kennecott primarily argues that the Occupational Safety and Health Administration regulations in 1972 first made the dangers of asbestos foreseeable. These regulations, while not irrelevant, are not dispositive in determining whether people knew about the risks from take-home exposure. They create legal liability but do not limit tort liability (much less limit tort liability for the years prior to the regulations in different jurisdictions). And we think the regulations—perhaps lagging some time behind scientific consensus—in no way rebut the evidence from Dr. Lemen showing that people generally understood the dangers from asbestos exposure well before their issuance.

4. Who Can Best Prevent the Loss

¶39 We have next asked "who can best bear the loss" occasioned by the injury. *Supra* ¶ 17. This factor doesn't refer to who has the financial resources to pay for the resulting damages. *Jeffs*, 2012 UT 11, ¶ 29. Rather, "this factor considers whether the defendant is best situated to take reasonable precautions to avoid injury. . . . [T]his factor would cut against the imposition of a duty where a victim or some other third party is in a superior position of knowledge or control to avoid the loss in question." *Id.* ¶ 30. So, going forward, we will more appropriately refer to this factor as "who can best prevent the loss."

¶40 Within the category at issue here—exposure to asbestos brought home from the workplace—premises operators have the greater "control" and "knowledge" that would allow them to prevent injury from take-home exposure. Premises operators will typically have greater control of workplace activities than employees. Most significantly, the premises operators may often choose not to introduce asbestos in the first place. In this case, for example, one defendant instructed workers to mix asbestos cement. The defendant—not the workers—had the capacity to

choose another cement mix; the workers simply had to follow the directions dictated by the contract their bosses made. *Cf. Mower*, 2018 UT 29, ¶ 29 (asking who could have prevented the instrumentality of the harm "in the first place"). We can hardly imagine "a superior position of . . . control" than the ability to choose not to use asbestos at all.

¶41 Further, premises operators can institute policies that reduce the likelihood of take-home exposure to asbestos. The premises operators respond that workers can also take steps to reduce take-home exposure to asbestos. True. But even if workers could take some remedial steps, the premises operators do not explain why they could not have implemented the same safety measures through workplace policies. Workers can only adopt a limited number of personal safety measures; the premises operators can require those same safety measures and also institute other workplace policies.

¶42 The premises operators also have the "knowledge" that would allow them to prevent danger from take-home exposure to asbestos. At least some employers who use asbestos presumably have expertise when choosing those materials: For example, they might employ research and development teams to research materials and make qualified decisions about how to safely use them. *Cf. Scott*, 2015 UT 64, ¶ 46 (determining that this factor didn't caution against finding a duty of care because prison officials were uniquely acquainted with potentially dangerous prisoners); *Jeffs*, 2012 UT 11, ¶ 31 (reasoning that a doctor's medical expertise gives them greater capacity to reduce harm resulting from use of a prescribed drug). And because companies using asbestos often employ many workers, they can more efficiently make decisions on behalf of the many people who might be exposed to the asbestos. *Cf. Herland*, 2015 UT 30, ¶ 39 (noting that gun owners may most efficiently prevent harm caused by their weapons because the injury-avoiding precautions would be "relatively slight"). Conversely, workers often lack any significant medical or industrial "knowledge" about workplace materials like asbestos, and they cannot efficiently acquire that knowledge. Even if they could, it makes little sense to require every employee to individually implement personal safety practices, rather than require the employer to make a single determination that protects all employees and their families.

¶43 For these reasons, premises operators have both greater "control" and "knowledge" necessary to prevent harm from take-

20

home exposure to asbestos. This factor therefore doesn't caution against the imposition of a duty.

5. Other Public Policy Considerations

¶44 Finally, we ask whether general policy considerations require a categorical decision removing duty from a class of cases. We have carved out common law exceptions from duty, for example, when people assume the risk of competitive sports. *Nixon v. Clay*, 2019 UT 32, ¶ 26, 449 P.3d 11. Our holding in *Nixon* was "an outgrowth of our longstanding doctrine of primary assumption of risk." *Id.*; *see also Ipsen v. Diamond Tree Experts, Inc.*, 2020 UT 30, ¶¶ 10 n.5, 13, 466 P.3d 190 (calling public policy considerations "determinative" because long-standing policies supporting rescuer exceptions from liability did not apply). But, typically, "public policy considerations don't endorse the wholesale rejection of a duty" even if they may "warrant limiting such a duty." *Mower*, 2018 UT 29, ¶ 40.

¶45 The premises operators argue that allowing for the existence of a duty here would create an overlarge, indeterminate class of plaintiffs. Indeed, other courts, including those ultimately finding a duty for take-home asbestos exposure, have expressed "concerns about exposing asbestos product manufacturers to uncabined liability to myriad plaintiffs in take-home asbestos exposure cases." *Ramsey*, 189 A.3d at 1262. We understand these concerns. But we do not think these concerns justify rejecting a duty wholesale, especially because we have only addressed a duty to prevent take-home exposure. *See supra* ¶ 15 n.4 (defining take-home exposure). Premises owners might cause other injuries, such as when a worker visits a friend after work in their work uniform. In future cases we can determine whether those injuries were foreseeable and whether liability would create an unduly indeterminate class of potential plaintiffs. For now, we have addressed liability only for a relatively narrow class of people.

¶46 Further, we doubt that this case will have far-reaching public policy implications. We only hold that premises operators have a duty of care when they introduce asbestos into the workplace. The defendants will still have an opportunity to address other elements of tort law. *Cf. Jeffs*, 2012 UT 11, ¶ 35 (noting that "[t]he requirements of breach and proximate cause . . . counterbalance any improper incentive" created by a broader duty). And given those other legal requirements, plaintiffs "may find it difficult to ultimately prevail in a negligence action." *Herland*, 2015 UT 30, ¶ 11 (establishing a duty of care but

recognizing the practical difficulties that sometimes limit a duty from making a significant difference as a matter of public policy). Other disincentives, like attorney fees and sanctions, will likewise prevent an onslaught of cases from unknown plaintiffs.

¶47 We therefore hold that premises operators like Kennecott and Conoco have a duty to exercise reasonable care to prevent take-home exposure to asbestos. When premises operators engage in affirmative acts that cause employees to come into contact with asbestos, *see supra* ¶ 27, they create a foreseeable risk that employees will carry asbestos into their homes. This risk was foreseeable as early as 1961, and no reason counsels against imposing a duty for creating this risk.

## II. RETAINED CONTROL

¶48 In 1973 Larry worked for Jelco-Jacobsen at PacifiCorp's plant. On appeal, Larry did not, in our view, adequately brief that PacifiCorp has direct liability for its premises.[12] Rather, Larry argues that PacifiCorp "retained control" over Jelco-Jacobsen and therefore assumes Jelco-Jacobsen's liability. PacifiCorp doesn't contend that Jelco-Jacobsen owed no duty to Barbara. So, for the sake of the dispute between Larry and PacifiCorp, we need to resolve only whether PacifiCorp "retained control" over Jelco-Jacobsen and therefore assumed liability. Importantly, because the retained control question reaches us on PacifiCorp's motion for summary judgment, we review the district court's decision for correctness and view the facts and make all reasonable inferences in favor of Larry. *See Herland v. Izatt*, 2015 UT 30, ¶ 9, 345 P.3d 661.

¶49 Utah follows the traditional common-law rule "that the employer of an independent contractor is not liable for physical

---

[12] Larry asserted that "PacifiCorp not only engaged in an affirmative act when it required Jelco-Jacobson to cut and install asbestos, it remained vicariously liable for the harm because it retained control over the method and means of Jelco-Jacobson's cutting and installation of the asbestos." Larry henceforth addressed only the retained control doctrine as applied to PacifiCorp. By not explaining how the claim of direct liability applied specifically to PacifiCorp, Larry denied PacifiCorp the opportunity to specifically respond to arguments concerning such liability.

harm caused to another by an act or omission of the contractor or his servants." *Thompson v. Jess*, 1999 UT 22, ¶ 13, 979 P.2d 322 (quoting RESTATEMENT (SECOND) OF TORTS § 409 (1965)) (internal quotation marks omitted). "This general rule recognizes that one who hires an independent contractor and does not participate in or control the manner in which the contractor's work is performed owes no duty of care concerning the safety of the manner or method of performance implemented." *Id.* The contractor—not the hiring party—is liable for its negligence.

¶50 The retained control doctrine is a common exception to this traditional rule. "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein . . . ." RESTATEMENT (SECOND) OF TORTS § 414 cmt. a; *see also Dayton v. Free*, 148 P. 408, 411 (Utah 1914) (discussing the same legal concept). "The rule . . . is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job." RESTATEMENT (SECOND) OF TORTS § 414 cmt. b.

¶51 Larry alleges a less common circumstance for invoking the retained control doctrine: He maintains that PacifiCorp "retained control" by virtue of its contractual obligations with Jelco-Jacobsen. *See id.* § 414 cmt. c (generally stating that retained control exists when there is "such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way").

¶52 We have applied the retained control doctrine in three cases. These cases have left unanswered the applicability of the retained control doctrine in the context of a "sophisticated part[y] who, by contract, stipulate[s] [it] will control the manner or method of work or the safety measures to be taken [retains control]—such as in contracts between general contractors and subcontractors involved in construction projects." *Thompson*, 1999 UT 22, ¶ 26 n.3. But, as we read these cases and consider the purposes of the retained control doctrine, we conclude that it may extend to a party who has retained contractual control.

¶53 This court formally adopted the retained control doctrine in *Thompson*. In defining the extent of necessary control, we said that "a principal employer is not subject to liability for injuries arising out of its contractor's work unless the employer 'actively participates' in the performance of the work." *Id.* ¶ 18. And we

defined "active participation" as when "the employer is actively involved in, or asserts control over, the manner of performance of the contracted work." *Id.* ¶ 19. "[T]he degree of control necessary for the creation of a legal duty must involve either the direct management of the means and methods of the independent contractor's activities or the provision of the specific equipment that caused the injury." *Id.* ¶ 20 (alteration in original) (citation omitted). We further clarified that "active participation" will often involve directing the injury-causing aspect of the work, like a principal contractor who instructed a subcontractor to implement a "faster method of dislodging . . . plywood" that ultimately caused an injury. *Id.* ¶¶ 22–23.[13] Although we assumed in *Thompson* that a party would usually "retain control" by actually exercising control, we left for another day the question we now confront: whether we might also find retained control in a "contract [that] stipulate[s] which party will control the manner or method of work or the safety measures to be taken—such as in contracts between general contractors and subcontractors involved in construction projects." *Id.* ¶ 26 n.3.

¶54 We next applied the retained control doctrine in *Begaye v. Big D Const. Corp.*, 2008 UT 4, 178 P.3d 343. We did not address contractually derived control, but we did clarify that a "general right" to control the operations doesn't necessarily mean that a party "retain[s] control." *Id.* ¶ 12–13 (citing *Thompson*, 1999 UT 22, ¶ 20). And we found the defendant there did not retain control because it only "controlled the sequencing of the task, as well as the workflow generally, but it had no discretion or control regarding the specifics of how [the product] was built or which bracing method was to be used." *Id.* ¶ 11. We contrasted this lack of control with circumstances in which a defendant "control[s] the method by which [the product] was braced prior to construction, . . . affirmatively interfere[s] with [a contractor's] work[,] . . . [or] insist[s] that a certain method be used to construct [the product]." *Id.* ¶ 13.

---

[13] In *Thompson*, we did not find that the defendant retained control because the contractor decided how to install a pipe that ultimately caused an injury due to an installation defect. 1999 UT 22, ¶ 24.

¶55 We then applied and expanded the retained control doctrine in *Magana v. Dave Roth Const.*, 2009 UT 45, 215 P.3d 143. Importantly, we defined a narrower rule for exempting employers from liability for their contractors' actions: We said that the traditional rule only applies "to circumstances in which the direct act or omission of the contractor, not the employer, causes an injury." *Id.* ¶ 22. So, *Magana* clarified that an employer "who hires an independent contractor and does not participate in or control the manner in which the contractor's work is performed owes no duty of care . . . ." *Id.* (quoting *Thompson*, 1999 UT 22, ¶ 13). In the earlier cases, by contrast, we first presumed that the employer did not have liability and asked whether they "actively participated" enough to retain liability. *Magana* effectively suggests a somewhat broader "active participation" standard and simply asks whose "direct act" or "control" caused the injury. There, we did not find that the defendant retained control—even though the defendant had a general "responsibility for on-site safety," we said that "a duty over general on-site safety cannot establish active participation." *Id.* ¶ 26. Nothing indicated that the defendant actively partook in the injury-causing activity, namely "the means and methods of rigging . . . trusses." *Id.* The defendant only had control over activities that "exceed[ed] the scope of the injury-causing activity." *Id.*

¶56 We now explain that contractual provisions may create sufficient control for a contracting party to retain control over the other party. We contemplated exactly such liability in a case preceding our formal definition of the retained control doctrine. *Dayton*, 148 P. at 411 (ruling that the general contractor wasn't liable for the subcontractor because "[n]othing is contained in the contract or specifications by which the company reserved or retained the right to direct or control the prosecution of the [injury-causing aspects of the] work"). Indeed, every court we're aware of has ruled that contractual provisions can contribute to a finding of "retained control." *See, e.g.*, *Stanley v. Ameren Illinois Co.*, 982 F. Supp. 2d 844, 853 (N.D. Ill. 2013) ("To decipher whether an employer retained control over an independent contractor, courts look to the contracts that establish the relationship. The best indicator of whether a contractor has retained control over the subcontractor's work is the parties' contract, if one exists." (citation omitted) (internal quotation marks omitted)); *Fleck v. ANG Coal Gasification Co.*, 522 N.W.2d 445, 448 (N.D. 1994) ("[T]he duty created by [Restatement] Section 414 may arise in two ways: through express contractual provisions retaining the right to

control the operative detail of some part of the work, or through the employer's actual exercise of such retained control at the jobsite."). It is a little linguistically awkward to talk about how contractual provisions drafted prior to any activity can indicate that a party "actively participated" in an injury-causing activity.[14] But this conclusion necessarily follows from the retained control doctrine's rationale, *i.e.*, the accepted proposition that someone who "directs" or "controls" an injury-causing behavior must accept liability for it. So, to determine whether a contractual provision gives a party retained control, we still ask if the contract itself "direct[ly] manage[s] . . . the means and methods of the independent contractor's activities or the provision of the specific equipment that caused the injury.'" *Thompson*, 1999 UT 22, ¶ 20 (quoting *Grahn*, 68 Cal. Rptr. 2d at 820). And we will still find that a party did not "actively participate" if the contract only grants that party a general responsibility for on-site safety. *Cf. Begaye*, 2008 UT 4, ¶ 12.

¶57 When considering whether a defendant retained control over someone else, courts consider whether all the means of control collectively constitute retained control—not whether any individual means of control alone suffices for retained control. *See, e.g., id.* ¶ 11 (assessing control over sequencing, workflow, specifics of building, and bracing method in the process of determining whether party "retained control"). And again, because we resolve this case on summary judgment, we make all reasonable inferences in Larry's favor and ask whether his allegations sufficiently present a question of fact.[15] Given this

---

[14] But it's certainly not the only time that a legal doctrine has an awkward name. As discussed earlier in this case, for example, until today the doctrine for establishing duties of care asked which party can best "bear the loss" when it meant to ask something entirely different: Who can most easily prevent the injury. *See supra* ¶ 39.

[15] In this case, we have no determination from a factfinder about the relevant "injury-causing activity." We have defined the "injury-causing activity" as "the legal cause of [the plaintiff's] injuries." *Magana*, 2009 UT 45, ¶ 28. In our court's prior retained control cases, the injury-causing activity has been effectively undisputed. *See, e.g., Thompson*, 1999 UT 22, ¶ 24 (stipulating the injury-causing activity as the relevant "manner of performance").

(continued . . .)

disposition, and as we now explain, we find that Larry has sufficiently alleged that PacifiCorp retained control over an injury-causing activity.

¶58 First, Larry notes that the contract explicitly required the subcontractor to use asbestos insulation, asbestos cement, asbestos-filled emulsion, asbestos cloth, and asbestos paper. Moreover, approval from PacifiCorp was required for any substitution in materials. *Cf. Purcell v. Varian Med. Sys., Inc.*, 2004 WL 639852, at *3–*4 (Cal. Ct. App. 2004) (finding no issue of fact on whether the general contractor retained control in part because the contract allowed the subcontractor to use alternative materials rather than asbestos, thereby meaning the general contractor did not entirely dictate the use of asbestos). We have said a party retains control if it controls "the provision of the specific equipment that caused the injury." *Thompson*, 1999 UT 22, ¶ 20 (quoting *Grahn,* 68 Cal. Rptr. 2d at 820). So, we need to determine whether to extend that to the provision of a particular injury-causing material.

¶59 We conclude that a party "actively participates" when it requires another to use a particular material. Larry cites *Wise v. Kentucky Fried Chicken Corp.*, 555 F. Supp. 991, 995 (D.N.H. 1983), for the proposition that a party "actively participates" when it requires a contractor to purchase certain brands of equipment that caused an injury. In that case, the court rejected a motion for summary judgment for two reasons: first, because the court did not have access to a "confidential operating manual" that franchisees of the defendant had to adhere to, and second, because the agreement required the parties to purchase approved materials. *Id.* The court said these conditions created issues of material fact. In this case, the agreement required Jelco-Jacobsen to use asbestos materials. Like in *Kentucky Fried Chicken*, the agreement contributes to a finding of an issue of material fact. Thus, we do not categorically exclude Utah courts from

_____

(continued . . .)

But here, no factfinder has determined the injury-causing activity. So, we must also make all reasonable inferences in Larry's favor about what constitutes an injury-causing activity within the bounds of what he has alleged.

considering whether a defendant required a party to use an injury-causing material.

¶60 Second, Larry argues that PacifiCorp had a general responsibility for testing and inspecting the materials and methods of work. To this end, the contract between PacifiCorp and Jelco-Jacobsen provided that PacifiCorp retained a general right to test, inspect, and order changes in the work and to stop the work if it deemed the work unsafe, while the contractor had to keep facilities clean. As we explained above, we have held that a party doesn't retain control if it only has "general responsibility" over the injury-causing activity. But courts may still consider that general responsibility. *See Stanley*, 982 F. Supp. 2d at 853 (N.D. Ill. 2013) (noting that contractual evidence of "retained control" is "not . . . conclusive, but it is not irrelevant"); RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (clarifying that "[i]t is not *enough* that he [an employer] has merely a general right" to control the work, but not saying such evidence is irrelevant (emphasis added)). As such, we do not think this general responsibility gets Larry very far, especially given that he will eventually need to argue that this general responsibility relates to a specific injury-causing activity. But it's another ingot of silver on the scale that counsels against a court resolving this question on a motion for summary judgment.

¶61 Third, Larry argues that PacifiCorp specifically required certain means and methods of work. In applying the retained control doctrine, courts have distinguished contracts that specify (1) the means and methods of work, (2) the conditions under which parties perform work,[16] and (3) contractual provisions

---

[16] In *Traudt v. Potomac Elec. Power Co.*, the court distinguished "methods and means" of work from "conditions under which the work is to be done." 692 A.2d 1326, 1335 (D.C. Ct. App. 1997). The power company had requested bids and specified a condition: Electricity would need to continue running during the installation. The court noted that the potential risk from energized waters was "known to [the power company] and for which it was obliged to take special precautions." *Id.* Similarly, many of the contractual provisions in this case may be understood to merely state "conditions" under which the work is to be done.

assuring the party receives a particular product.[17] For the contract to indicate retained control over the contractor's work, the contract must control the means and methods of work. The contractor has the responsibility to ensure safe working conditions when it anticipates the conditions of the work and the expected final product. It cannot, however, plan around a contract that requires certain "means and methods."

¶62 Here, Larry argues that "PacifiCorp specified—over more than six pages—how Jelco-Jacobson [sic] was to cut and install the insulation, where formed sections and staggered joints were required, and the amount and thickness of the insulation." Many provisions of the contract speak only to the final product. To the extent the contract provides, as Larry alleges, where formed sections and staggered joints were required, it would only specify the product that Jelco-Jacobsen needed to provide to PacifiCorp. But at least some provisions of the contract define means and methods of work that might have caused the injury. The contract,

---

[17] In *Golik v. CBS Corp.*, 472 P.3d 778 (Or. Ct. App. 2020), the court did not even grant that specifications about how to install the materials would create retained control. The court applied a retained control doctrine that turned on the "ultimate question [of] whether the employer, rather than the independent contractor, is acting, or is entitled to act, like the worker's direct employer." *Id.* at 798. The court dismissed most of the plaintiff's arguments because it construed the provisions to ensure that the party would receive the "product which it desires"—not to control the "means or methods." *Id.* These provisions included "detailed specifications for installation of asbestos-containing insulation on equipment," requirements to comply with "basic safety rules" of the worksite, and a provision that required approval for using another subcontractor for work. *Id.* at 799. The provision requiring the party to comply with safety rules "contribute[d] some weight to a body of evidence indicating that defendant retained control over the safety of [the contractor's] work." *Id.* But the court did not think that provision alone established "retained control," and even considered the referenced provisions specifying how to install the insulation insufficient to "retain control." *Id.*

for example, requires that the "cement shall be mixed in strict accordance with the manufacturer's directions," and that layers of cement must dry before applying a succeeding layer. These provisions specify precisely how Jelco-Jacobsen needed to handle the asbestos cement. Rather than specifying the final product (such as an asbestos cement with a defined density), these provisions speak to the "means and methods" of work necessary for creating the final product. So, at least, these provisions directly address how Jelco-Jacobsen was to complete its work. Arguably, other provisions might as well. Especially because control through contractual arrangements is generally treated as "a fact-driven issue," *Stanley*, 982 F. Supp. 2d at 852 (N.D. Ill. 2013), the factfinder should determine whether other contractual provisions also show that PacifiCorp retained some control over the means and methods of work. And those means and methods of work may have been the "injury-causing activity" that led to Barbara's mesothelioma. *See supra* ¶ 57 n.15.

¶63 Fourth, Larry argues that PacifiCorp "retained control" through its specific responsibility over a "dust removal" program. Even jurisdictions that agree with Utah that a general responsibility for safety will not alone constitute "retained control" typically establish that a specific responsibility for safety *will* sufficiently constitute retained control. *See, e.g., Diaz v. R & A Consultants*, 579 S.W.3d 460, 473 (Tex. Ct. App. 2019) ("[G]enerally insisting that a subcontractor comply with . . . general safety guidelines . . . does not impose an unqualified duty to ensure that the subcontractor does nothing unsafe. Rather, imposing those type of obligations creates only a limited duty that any safety requirements and procedures the general contractor imposes do not 'unreasonably increase, rather than decrease, the probability and severity of injury.'" (citation omitted)). Safety requirements will create a narrow duty of care when those requirements relate to the cause of the ultimate injury. *Cf. Hooker v. Dep't of Transp.*, 38 P.3d 1081, 1089 n.3 (Cal. 2002) ("[I]f the hirer promises to undertake a particular safety measure, then the hirer's negligent failure to do so should result in liability if such negligence leads to an employee injury."); *see also, e.g., Moss v. Rowe Const. Co.*, 801 N.E.2d 612, 620 (2003) (distinguishing general and specific safety requirements); *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998) (saying that, "consistent with the *Restatement . . .* [Texas courts conclude] that safety requirements give rise to a *narrow* duty of care" and further explaining that Texas courts hold principals liable for not exercising their general duty to cease

operations when they become aware of specific violations of safety provisions).

¶64 The contract here reserves specific responsibility over dust control safety measures. Specifically, the contract provides that PacifiCorp will direct Jelco-Jacobsen to prevent the spread of dust through measures such as "sprinkling."[18] When a contract reserves such responsibility over dust control, the responsible party retains control (and therefore liability) for any injuries caused by the dust. The contract here reserved responsibility for dust control safety. Because PacifiCorp was responsible for dust control—and because the lack of dust control may have caused the eventual injury to Barbara—PacifiCorp may have violated its duty of care to Barbara. *Cf. Condon v. Union Oil Co. of Cal.*, 2004 WL 1932847, at *4 (Cal. Ct. App. 2004) (explaining that defendant was responsible for dust control because the owner scheduled other simultaneous work projects that exposed plaintiff to asbestos dust).

¶65 Because these four contractual provisions show that PacifiCorp retained at least some control over Jelco-Jacobsen, we reverse and remand. The factfinder will appropriately define the injury-causing activity or activities in this case and determine whether PacifiCorp retained control over any injury-causing activity.

## CONCLUSION

¶66 We hold that the premises owners are liable to their employees' co-habitants for take-home asbestos exposure. And we hold that a genuine issue of material fact exists about whether PacifiCorp retained control over Jelco-Jacobsen. As such, we affirm the district court's denial of Kennecott's motion for summary judgment, reverse the district court's grants of summary judgment for PacifiCorp and Conoco, and remand for further proceedings not inconsistent with this opinion.

---

[18] In full, the provision reads: "The Contractor shall institute and maintain, as directed by the Owner and/or Engineer, adequate dust control measures such as sprinkling, for all his work areas, haul routes, and parking areas. For the purposes of this contract, adequate dust control shall be considered as controlling generation of dust such that dust does not cause discomfort to personnel or impaired visibility."

_____