**2021 UT 41**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

JEREMY KIRK,
*Appellant*,

*v.*

MARK ANDERSON, M.D., and BROADSPIRE SERVICES, INC.,
*Appellees*.

No. 20191020
Heard March 8, 2021
Filed August 5, 2021

On Direct Appeal

Third District, Salt Lake
The Honorable Barry G. Lawrence
No. 190905655

Attorneys:

Leonard E. McGee, Peter R. Mifflin, Sandy, for appellant

Michael J. Miller, Katheleen Abke, Salt Lake City, for appellee
Mark Anderson

Ford G. Scalley, Bradley W. Madsen, Scarlet R. Smith, Salt Lake
City, for appellee Broadspire Services, Inc.

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE
PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1　The aftermath of a vehicle accident that left appellant,
Jeremy Kirk, with numerous injuries leads us to contemplate
whether a physician performing an independent medical
examination (IME) owes a duty of care to an examinee. We

decline Kirk's invitation to announce such a broad and uncompromising duty, basing our decision primarily on important policy considerations relevant to the duty analysis.[1] As such, we affirm the district court's grant of appellees' motion to dismiss.

## BACKGROUND

¶2 This case arises from a car accident that occurred on April 16, 2015. Appellant, Jeremy Kirk, was rear-ended by another driver while stopped at a stoplight. At the time of the accident, Kirk was in the course and scope of his employment with Park City Plumbing. After the accident, Kirk drove himself home. Later the same day, he visited a hospital, complaining that his "whole left side hurt." In the ensuing months, Kirk received diagnostic imaging and treatment for a number of symptoms allegedly caused by the collision.

¶3 Because this accident occurred on the job, Kirk made a claim for workers' compensation benefits through Park City Plumbing. Park City Plumbing had contracted with American National Property & Casualty as its workers' compensation insurance carrier. Broadspire Services, Inc. is a third-party administrator of American National Property & Casualty and, as such, coordinates claims between the insurer and claimants. Kirk was one such claimant whose claim was coordinated by Broadspire.

¶4 Broadspire—through Genex Services, LLC—ultimately arranged for an IME of Kirk's injuries for the purpose of evaluating the workers' compensation claim, retaining Doctor Mark Anderson to perform this evaluation. In October 2016, Anderson conducted his evaluation of Kirk's injuries by both meeting with Kirk and reviewing Kirk's medical records. Anderson's report was returned to Genex in November 2016.

¶5 Anderson's report concluded that the accident caused Kirk to suffer a transient cervical strain and that all other symptoms that Kirk complained of or had been treated for since the accident were secondary to pre-existing conditions. Building upon that conclusion, Anderson further concluded that Kirk:

---

[1] We expressly leave open, however, the possibility that an independent medical examiner may owe an examinee limited duties not implicated by the facts of this case. *See infra* ¶¶ 9, 25 n.12.

could return to work with only the limitation of his pre-existing arthritis; had achieved maximum medical improvement on April 19, 2015, three days after the accident; should be released from care with no restrictions; and did not qualify for an impairment rating apportionable to the work-related accident. As a result of the IME report, Broadspire denied Kirk various forms of workers' compensation benefits. Anderson's report also noted, importantly, that he had "informed [Kirk] that as this was an Independent Medical Evaluation, [Anderson] would not be giving [Kirk] medical advice[,] . . . [they] were not establishing a doctor/patient relationship, and [Anderson] would not become [Kirk's] treating physician in the future."

¶6     Kirk disagreed with Anderson's conclusions and filed an application for a hearing before the Utah Labor Commission. Three years after the accident, the Utah Labor Commission determined that the 2015 accident caused "a left knee ACL tear; aggravation of pre-existing L4-S1 spine degeneration; temporary cervical whiplash; and a mild concussion." The Commission then ordered "that Park City Plumbing and/or American National Property & Casualty . . . pay Jeremy Kirk's historical medical expenses for services provided in relation to his April 16, 2015 industrial accident."

¶7     Kirk then filed a complaint in district court alleging negligence and reckless conduct against Anderson and vicarious liability against Broadspire for Anderson's conduct. Kirk alleged various injuries stemming from the delay in proceedings caused by the allegedly erroneous IME.[2] Broadspire moved to dismiss based on the theory that Anderson did not owe Kirk a duty of care because no physician-patient relationship exists in the context of an IME. Thus, Broadspire argued, it could not be vicariously liable for the alleged negligence. Anderson later joined Broadspire's motion. The district court heard argument from each of the three parties and ultimately granted the motion to dismiss based upon two Utah cases: *Joseph v. McCann*, 2006 UT App 459, 147 P.3d 547, and *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228.

_____

[2] Specifically, Kirk complains that: he suffered "delayed or denied payments of medical expenses, delayed or denied payments of temporary disability payments, [and] delayed or denied payments of permanent disability payments"; the delay "unnecessarily prolonged and aggravated" his "mental and emotional pain and suffering arising from the accident"; and he had to hire experts to rebut the IME.

The district court reasoned that these two cases, taken together, stand for the proposition that a health care provider who is conducting an IME doesn't owe an actionable duty of care to the person being evaluated. Kirk appeals on the grounds that the district court misinterpreted *McCann* and *Jeffs*. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶8    "We review the grant of a motion to dismiss for correctness, granting no deference to the decision of the district court." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275.

## ANALYSIS

¶9    The question before us is whether the district court erred in finding that an independent medical examiner owes no duty of care to an examinee. Kirk lodges two separate bases for establishing a duty in such circumstances: first, that a limited physician-patient relationship exists between examiners and examinees; and second, that, even absent a physician-patient relationship, a health care provider owes a limited duty to a non-patient arising from the provider's affirmative act. We reject Kirk's first argument in full because (1) he appears to misunderstand the purpose of an IME, and (2) no express or implied contract to provide treatment existed between Kirk and Anderson. As for Kirk's second argument, though we don't disagree that a duty may exist between a health care provider performing an IME and an examinee in certain circumstances, we find that it doesn't extend to harm claimed to have been suffered as a result of a delay in legal proceedings[3] occasioned by the health care provider's alleged negligent act. As such, we affirm the trial court's dismissal of Kirk's complaint for failure to state a claim.

---

[3] By "delay in proceedings," we mean a delay in any process by which the injured person stands to gain a potential benefit. Here, we use it to refer to the workers' compensation process, which was supposedly delayed due to Anderson's alleged misrepresentation, causing Kirk to pursue a separate examination by the Utah Labor Commission. The term may also refer, for example, to a delay in litigation, such as when an expert's opinion results in a denial of summary judgment, requiring the plaintiff to continue litigation in trial.

## I. A PHYSICIAN-PATIENT[4] RELATIONSHIP DOES NOT EXIST HERE

¶10 We begin with Kirk's first argument in favor of finding a duty, which we reject outright. Kirk argues that independent medical examiners owe examinees a duty of care due to the existence of a special relationship, specifically in the workers' compensation context. In response, appellees point us to the court of appeals' holding in *Joseph v. McCann*, arguing that it stands for the principle that "a physician who is retained by a third party to conduct an examination of another person and report the results to the third party does not enter in a physician-patient relationship with the examinee." *See* 2006 UT App 459, ¶ 15, 147 P.3d 547 (quoting *Ervin v. Am. Guardian Life Assurance Co.*, 545 A.2d 354, 357 (Pa. Super. Ct. 1988)). And while *McCann*, as a determination by the court of appeals, is not binding authority, we find its reasoning persuasive and adopt it here. Kirk doesn't refute *McCann*'s holding (for purposes of his first argument) but challenges its application to the facts before us. We disagree with his challenge.

¶11 "The existence of a physician-patient relationship between a physician and an individual can only be recognized when the individual is in fact a patient." *Id.* ¶ 12. The question here, then, is not whether an independent medical examiner may be considered a physician, but rather who may be considered a patient. *McCann* cites to the Utah Health Care Malpractice Act in providing an answer:

> [A patient is defined as] "a person who is under the care of a health care provider, under a contract, express or implied." Health care is defined as "any act

---

[4] We use the terms "physician" and "health care provider" interchangeably throughout this opinion. "Physician" has typically been used in our case law to refer to the special relationship between a medical professional and patient—as such, we continue to employ the term "physician-patient relationship." But we emphasize that "health care provider" is a more inclusive term as it refers to a broader population of medical professionals including, for example, nurses and psychotherapists, who are also subject to duties arising from special relationships with patients. *See, e.g.*, UTAH CODE § 78B-3-403(12) (providing a list of "health care providers" who may be subject to medical malpractice liability arising from a special relationship).

> or treatment performed or furnished . . . by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement."

*Id.* (second alteration in original) (citations omitted) (quoting UTAH CODE ANN. § 78-14-3(22) & (10) (Supp.2006)).[5] *McCann* further states that a physician-patient relationship exists "if the professional services of a physician are accepted by another person for the purposes of medical . . . treatment. This relationship is consensual, and one in which the patient knowingly seeks the assistance of a physician and the physician knowingly accepts him as a patient." *Id.* (alteration in original) (citation omitted) (internal quotation marks omitted). One rule that the *McCann* court distilled from these authorities was that, to be considered a patient, a plaintiff must have been evaluated for or provided treatment. *See id.* ¶ 13. But the analysis didn't stop there. To establish a physician-patient relationship, an express or implied contract must exist, and such a contract arises from what might be characterized as a bargained-for exchange, with consideration, between a plaintiff seeking treatment and a physician providing treatment. *See id.* ("Because [plaintiff] did not seek treatment from [defendant], nor did [defendant] provide treatment to [plaintiff], [defendant] was not under an express or implied contract to provide health care to [plaintiff]. Thus, no physician-plaintiff relationship existed . . . .").

¶12   Kirk doesn't appear to disagree with the first part of this reasoning, as he acknowledges the plaintiff in *McCann* had been evaluated solely to determine his fitness as a police officer, and the examiner "never contemplated providing any sort of care or treatment to" the plaintiff. Rather, Kirk argues that *McCann* doesn't apply "[i]n the worker's [sic] compensation context, [where] providing necessary treatment and care . . . is one of the principal aims."

¶13   We very much disagree with Kirk's view of the purpose of an IME in a workers' compensation claim. As with evaluations of the fitness of an examinee for a particular occupation, *see McCann*, 2006 UT App 459, an IME of an allegedly injured

---

[5] The Utah Health Care Malpractice Act has since been renumbered to section 78B-3-401–426, with "patient" defined at subsection 403(23) and "health care" defined at subsection 403(10).

employee for workers' compensation purposes is, generally speaking, not performed for the purpose of providing treatment. Rather, the purpose of an IME, in the workers' compensation setting, is to provide the carrier, and potentially the relevant fact finder, with independent information on the claimant's injuries. *See* KENNETH J. BROWNLEE & PATRICK MAGARICK, 1 CASUALTY INSURANCE CLAIMS § 7:13 (4th ed. 2021) ("An 'independent' medical examination is exactly that—it involves no treatment . . . . IMEs should be utilized . . . [t]o help determine if the alleged injuries or disability resulted from the accident giving rise to the claim, and to corroborate the injuries claimed."); *Dyer v. Trachtman*, 679 N.W.2d 311, 315 (Mich. 2004) ("In the particularized setting of an IME, the physician's goal is to gather information for the examinee or a third party for use in employment or related financial decisions. It is not to provide a diagnosis or treatment of medical conditions."); *Reagan v. Newton*, 436 P.3d 411, 419 (Wash. Ct. App. 2019) (noting that the relationship between an independent examiner and examinee "does not involve the full panoply of the physician's typical responsibilities to diagnose and treat the examinee for medical conditions" (quoting *Dyer*, 679 N.W.2d at 314–15)); *Boulevard Multispec Med., P.C. v. Tri-State Consumer Ins. Co.*, 43 Misc.3d 802, 805 (N.Y. D. Ct. 2014) ("[T]he purpose of an IME . . . is to permit the insurer to determine the nature and extent of the injured party's injuries, whether the injured party needs additional treatment or testing for those injuries and for how much longer such treatment might be needed.").

¶14 Even if Kirk were correct in arguing that workers' compensation's "sole purpose for being is to provide injured workers' necessary and reasonable medical care" (and he is not), his argument would nonetheless fail. We agree with *McCann*'s holding that, in addition to treatment, there must be an "express or implied contract to provide health care" between the parties. *McCann*, 206 UT App 459, ¶ 13. No such contract existed between Kirk and Anderson. Notably, during the IME, Anderson "informed [Kirk] that [they] were not establishing a doctor/patient relationship."[6] And even if this express disclaimer

---

[6] An implicit contract formed by an actual bargained-for provision of treatment may, however, defeat an express waiver of a physician-patient relationship. As such, we find it important to note that Anderson's express disclaimer is not a *per se* waiver of a special relationship, but it does serve as an indication of

(continued . . .)

were insufficient, the facts provide further support. Kirk did not "knowingly seek[] the assistance of a physician," *id.* ¶ 12 (citation omitted)—to the contrary, Kirk admits that he "was required to submit" to an IME "by a provider of Broadspire's choice." And Anderson did not "knowingly accept[] [Kirk] as a patient," *id.* (citation omitted), but rather agreed with Genex to conduct an IME for an employee of Park City Plumbing, who carried workers' compensation insurance under American National Property & Casualty, who in turn contracted with Broadspire to act as a third-party administrator, who hired Genex. This tortuous path from Kirk to Anderson dispels any suggestion that even an implicit contract existed between them.

## II. HEALTH CARE PROVIDERS OWE NO DUTY FOR INJURIES FLOWING FROM A DELAY IN PROCEEDINGS

¶15 We now turn to Kirk's second argument in favor of finding a duty, which relies on our holding in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, 275 P.3d 228. He argues that, absent a physician-patient relationship, a health care provider nonetheless "owe[s] a duty of care arising from his own affirmative conduct." And he insists that the district court erroneously dismissed his claim for want of a legal duty under *Jeffs*. While we agree with Kirk that, under *Jeffs*, "non-patients are not categorically barred from seeking redress for malpractice committed by Utah healthcare providers," we nevertheless conclude that *Jeffs* doesn't extend to the circumstances in this case. Specifically, we decline to find a duty where, as here, the harms allegedly caused by the health care provider in providing an IME flow from a delay in proceedings.[7] We reach this conclusion based on the policy-based fifth factor of the *Jeffs* test. We begin with a brief overview of the *Jeffs* test and then explain why we decline to find such a duty here.

---

Anderson's intent to merely perform an IME on behalf of his employer and not to enter into a physician-patient relationship with Kirk.

[7] The one harm Kirk claims that arguably does not flow from a delay is the alleged cost of hiring an expert to rebut the IME. Rather than aid Kirk's argument, this allegation further cements our view that creating a duty along the lines Kirk suggests would, as we explain below, *infra* ¶¶ 22–23, greatly jeopardize the use of experts in litigation and other proceedings.

*A. The* Jeffs *Test*

¶16 Kirk is correct in arguing that a physician-patient relationship is not a "categorical predicate" in bringing a medical malpractice action.[8] In *Jeffs*, we recognized that "a special relationship or physician-patient relationship need not underlie the defendants' duty to the plaintiffs" when a nurse had negligently prescribed a cocktail of medications to a patient, causing a violent outburst in the patient that culminated in the murder of the patient's wife. *Jeffs*, 2012 UT 11, ¶¶ 2, 19. In recognizing that such a duty may exist, we synthesized a balancing test from factors previously identified in our case law that serves as a limiting principle for all unintentional tort actions (not just those between a health care provider and non-patient). So, in determining whether a defendant owes a duty to a plaintiff, we consider:

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations.

*Id.* ¶ 5 (citations omitted) (internal quotation marks omitted). And because we recognized that "[n]ot every factor is created equal," we characterized the first two factors as "'plus' factor[s]—used to impose a duty where one would otherwise not exist," and the latter three factors as "'minus' factors—used to eliminate a duty that would otherwise exist." *See id.*

¶17 Before moving on, we take this opportunity to express what has been implied by our developing case law following *Jeffs*: The third factor regarding foreseeability has since taken on an elevated role in this court's duty analyses, represented in both *Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶ 44, 356 P.3d 1172, and

---

[8] To the extent that Kirk argues "[t]he trial court erroneously require[ed] a traditional doctor-patient relationship as a necessary factual predicate to a medical malpractice action," we disagree, finding this conclusion to be a misreading of the trial court's order. The trial court contemplated the application of *Jeffs* in the absence of a physician-patient relationship and ultimately determined that no legal duty existed. *See* Order granting Mot. to Dismiss, *Kirk v. Anderson*, 4–5, No. 190905655 (Nov. 15, 2019).

*Herland v. Izatt*, 2015 UT 30, ¶ 14, 345 P.3d 661. *See also Boynton v. Kennecott Utah Copper, LLC*, 2021 UT 40, ¶ 21, -- P.3d --. As such, we now formally acknowledge that it may be used as a "plus" factor in *Jeffs* analyses, and we may rely upon it in imposing "a duty where one would otherwise not exist." *Jeffs*, 2012 UT 11, ¶ 5.

¶18    Though considered "minus" factors, the final two *Jeffs* factors are certainly important. Thus, even if the "plus" factors are present, these "minus" factors may nonetheless carry the day if the underlying policy considerations outweigh the factors indicating the existence of a duty. *See, e.g.*, *Nixon v. Clay*, 2019 UT 32, ¶ 15, 449 P.3d 11. Our analysis today focuses on the fifth *Jeffs* factor, which ultimately carries the day in determining that a duty does not exist in this case.

¶19    The fifth *Jeffs* factor acts as a catch-all under which we've considered a range of public policy concerns both within the health care malpractice field and beyond. *See Jeffs*, 2012 UT 11 ¶¶ 33–35 (dismissing defendants' argument that "recognition of a physician's duty to nonpatients will diminish the availability of prescription medications"); *id.* ¶ 36 (dismissing defendants' argument that recognition of a duty will impact "malpractice insurance and healthcare costs"); *id.* ¶¶ 37–38 (dismissing defendants' arguments that recognition of a duty "will interfere with confidentiality in physician-patient relationships" and will "conflict with the physicians [sic] duty of loyalty to her patient"); *id.* ¶ 39 (recognizing "the complexity of the medical professional's sphere of judgment" but finding that such complexity doesn't always supersede "professional responsibility for negligence" and that "a 'complex universe of patient care' does not make injured nonpatients' injuries any less troubling"); *see also Nixon*, 2019 UT 32, ¶ 23 (rejecting a finding of tort liability in "high-contact sports" because otherwise "the majority rule could impose liability on players for simply playing the game as it is designed and expected to be played"); *Mower v. Baird*, 2018 UT 29, ¶ 31–36, 422 P.3d 837 (finding defendants' policy argument that recognition of a duty to the parents of a minor patient "would 'chill' a therapist's treatment of a minor child's sexual abuse trauma" was insufficient to reject a categorical duty but warranted a limitation on the duty); *Scott*, 2015 UT 64, ¶¶ 47–49 (balancing the public policy concerns favoring prison rehabilitative programs "with the tort law policy of compensating injured parties").

## B. Public Policy Disfavors a Duty for Injuries Flowing from a Delay in Proceedings

¶20 Our decision today contemplates the circumstance in which an expert[9] allegedly causes a delay in proceedings, and a plaintiff alleges injury as a result of that delay. Following the *Jeffs* test in order, one might feel compelled to first answer whether the facts satisfy the "plus" factors in recognizing a duty between Anderson and Kirk. Maybe they do, maybe they don't. The answer to this question, however, is of no moment because we find that, if we address the "minus" factors—in particular, the fifth factor— first, the underlying policy considerations weigh strongly in favor of imposing no duty. Thus, we assume for purposes of our analysis that the *Jeffs* "plus" factors—that is, an affirmative act with foreseeable harms—exist in this case.

¶21 In addressing the fifth *Jeffs* factor, the general public policy considerations that lead us to our conclusion are: (1) there is no limiting principle that would prevent the chilling of expert involvement in disputes if we were to accept Kirk's argument that health care providers owe a duty of care in performing IMEs; (2) experts play a crucial role in all manner of proceedings in providing unbiased expertise and preserving trust relationships; and (3) experts typically have no special relationship with the subject of their examination, analysis, or opinion, but rather a contractual relationship with their client.[10]

---

[9] We use the term "expert" to refer to a witness upon whose opinion a party relies in order to obtain a benefit or to present a defense. Here, the expert is a physician serving as an independent medical examiner. It may also include, for example, an expert witness called to testify at trial.

Additionally, the experts we contemplate in this opinion do not include experts hired by the party alleging injury, but rather court-appointed experts, opposing-party experts, and independent medical examiners. For the ease of the reader, all references to experts in this opinion exclude experts employed by the injured party.

[10] We note, importantly, that nothing in this opinion alters the tort and contractual duties that may be owed by an expert to their client. *See infra* ¶ 25 n.12. This opinion specifically addresses experts *not* hired by the party alleging harm, such as independent medical examiners, court-appointed experts, and opposing party's experts. *See supra* ¶¶ 9 n.3, 20 n.9.

¶22   We address each of these policy arguments in turn as we determine whether an expert owes a duty of care to a party in a legal matter to not cause a delay in proceedings. Our overarching concern today is that there is no clear limiting principle that would prevent experts across the board from becoming liable when their professional opinions cause delays in proceedings. For example, an expert, or even a private insurance adjuster, asked to testify at a mediation hearing could be liable for giving testimony that delays a party's relief. We are deeply concerned that this liability would chill or suppress honest and unfettered expert opinions, which have significant societal value. And we are not alone in this concern. For example, the Supreme Court of Michigan noted the "unacceptable risk" of chilling expert testimony in imposing liability. *Dyer v. Trachtman*, 679 N.W.2d 311, 315–16 (Mich. 2004) ("To permit such an action would make it impossible to find any expert witness willing to risk a lawsuit based on his testimony as to his opinions and conclusions . . . ." (quoting *Hafner v. Beck*, 916 P.2d 1105, 1108 (Ariz. Ct. App. 1995))); *see also Smith v. Radecki*, 238 P.3d 111, 115 (Alaska 2010) (noting that courts that have declined to find a duty in the IME context "rely principally upon the desire not to chill the willingness of doctors to act as expert witnesses in workers' compensation cases"); *Martinez v. Lewis*, 969 P.2d 213, 219 (Colo. 1998) (en banc) (warning that "physicians would be less likely to perform IMEs altogether given the liability risks").

¶23  Next, experts serve a critical role in proceedings as sources of unbiased expertise. This service facilitates the relationships between parties without otherwise conflicting interests—relationships which carry their own societal value. For example, though not to be conflated with health care providers engaged in physician-patient relationships, independent medical examiners do play a vital role in the overall administration of health care benefits and workers' compensation benefits. In these situations, the independent medical examiner offers an unbiased opinion assessing specifically whether the patient's work-related injury requires treatment, while the injured person's own health care provider is able to administer care without influence by insurance companies (thus preserving the provider's loyalty to the patient and the patient-provider trust dynamic)—patients enjoy unbiased care while the insurance companies still benefit from the opinions of medical professionals. *See* Shanil Ebrahim et al., Commentary, *Ethics and Legalities Associated with Independent Medical Evaluations*, 186 CANADIAN MED. ASS'N J. 248, 248 (2014) (noting that, in traditional physician-patient relationships, health

12

care providers may be held liable for damages if they don't appear to act in the patients' best interests); *see also Lydon v. Sprinkler Servs.*, 841 A.2d 793, 795–96 (Me. 2004) (noting that IMEs serve "to prevent 'doctor shopping' and reduce litigation"). Recognizing a duty owed by an independent medical examiner has the potential to disrupt this valuable system.

¶24 It is also important to note the purpose of an IME in addressing related public policy concerns. As stated above, *supra* ¶ 13, the purpose of an IME in the workers' compensation context is to identify injuries caused by work-related accidents to determine benefits owed. An IME, in other words, is just one step in the workers' compensation process, a process that contains its own safeguards against delays in payment of benefits. *See Gunderson v. May Dep't Stores Co.*, 955 P.2d 346, 352 (Utah Ct. App. 1998) (noting that the Utah Workers' Compensation Act "provides specific remedies" for delays in payment). There is no need, then, to subject a third party to liability in order to provide an injured party with an extra remedy—particularly not when this belt-and-suspenders approach could have the adverse effect of chilling expert testimony.

¶25 Finally, an independent medical examiner has a contractual relationship with the entity that employs them but no preexisting relationship with the subject of the examination. And this contractual relationship is often independent of, if not adverse to, the subject's relationship with the examiner's employer. To impose a categorical duty of care running from the independent medical examiner to the subject would put the examiner in an untenable position, if not create an outright conflict of interest. *See, e.g.*, J.R. Shepherd, *Physician giving medical examination to insurance applicant as agent of insured or of insurer*, 94 A.L.R.2d 1389, § 2[a] (1964) ("[A] physician who examines applicants for insurance . . . is generally recognized as being the agent of the insurer, and not the insured . . . .");[11] *Joseph v. McCann*, 2006 UT App 459, ¶ 14, 147 P.3d 547 (noting that the independent medical examiner owed a duty to the city because he had "contracted with the City to provide an IME of" the plaintiff). We need not discuss today the parameters of the standard of care

---

[11] We do not mean to suggest that all independent medical examiners are agents of the insurer in Utah. We cite to this American Law Report merely as support in our policy analysis. Whether an independent medical examiner would qualify as an agent of the insurer is a question for another day.

owed by an independent medical examiner to their hiring insurer—that question is not before us. But we can safely say that an independent medical examiner who has otherwise conducted an IME in good faith and has met their standard of care has fulfilled their duty, regardless of whether the results were favorable to the insurer or to the IME subject. Thus, if we are to assume the facts before us favor a duty under the *Jeffs* "plus" factors, we nonetheless find that policy considerations favor no duty owed by an expert whose professional opinion causes a delay in legal proceedings. So, even if Anderson's IME report constituted an affirmative act with foreseeable harms, he is not liable for Kirk's injuries resulting from the delay in the workers' compensation proceedings.[12]

---

[12] None of this is to suggest that there are no circumstances in which an independent medical examiner *would* owe a duty of care to an examinee. In fact, this court noted that examiners must "avoid affirmatively causing physical injury" during an IME. *Jeffs*, 2012 UT 11, ¶ 17. Put another way, *Jeffs* stands for the proposition that the "duty would be as obvious as the ensuing injuries"—that is, the use of "a scalpel instead of a tongue depressor to facilitate a throat examination" would be an affirmative act with foreseeable harms giving rise to a duty, *id.* ¶ 17, while an IME report alone is not.

And *Jeffs* wasn't the only time this court specifically contemplated an affirmative act with foreseeable harms in the physician-nonpatient context. In *Mower*, we held that a mental health therapist has a duty "to refrain from recklessly causing a nonpatient parent physical harm to his or her body or property or severe emotional distress by giving rise to false memories or fabricated allegations of sexual abuse committed by that parent through affirmative acts when treating the parent's minor child." 2018 UT 29, ¶ 113. We also find illuminating the Michigan case cited in Anderson's brief in which the court found a limited duty where an independent medical examiner negligently caused further injury to the examinee by over-rotating the examinee's injured shoulder. *Dyer*, 679 N.W.2d 311. The Supreme Court of Michigan identified an affirmative act with a foreseeable harm in the actual performance of an IME and held that a duty exists "to exercise care consistent with [the independent medical examiner's] professional training and expertise so as not to cause physical harm by negligently conducting the examination." *Id.* at 317.

**CONCLUSION**

¶26 Today is a reminder of the powerful role public policy considerations can appropriately play in our judicial system. In cases such as this, it is our duty, as judges, to consider public policy to determine whether the societal cost of a legal intervention, such as tort liability, outweighs its social utility. Because we find those costs too high today, we affirm the district court's grant of appellees' motion to dismiss.

————————