2024 UT App 85

## THE UTAH COURT OF APPEALS

STAGE DEPARTMENT STORE AND
NEW HAMPSHIRE INSURANCE COMPANY,
Petitioners and Cross-respondents,
*v.*
SHELLY MAGNUSON,
Respondent and Cross-petitioner,
*v.*
LABOR COMMISSION,
Respondent.

Opinion
No. 20220825-CA
Filed June 6, 2024

Original Proceeding in this Court

Eric J. Pollart, Attorney for Petitioners
and Cross-respondents

Jay K. Barnes and Virginius Dabney, Attorneys for
Respondent and Cross-petitioner

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1 Shelly Magnuson fell at work and suffered injuries. She made a claim for workers' compensation benefits, ultimately claiming that she was permanently disabled. In light of her years-long history of significant pain complaints and a material dispute in medical opinions from various physicians concerning her diagnosis and the cause or causes of her symptoms, a medical panel was appointed. Subsequently, an administrative law judge (ALJ) confirmed a period of temporary disability but otherwise largely ruled against Magnuson, whereupon she sought review with the Appeals Board of the Utah Labor Commission (Appeals

Board). The Appeals Board confirmed the ALJ's determinations but extended the term of temporary disability by one year. Both the employer and Magnuson brought petitions for judicial review. We decline to disturb the order of the Appeals Board.

BACKGROUND[1]

*Pre-accident Medical Conditions*

¶2 Magnuson has suffered for many years from "chronic pain symptoms affecting various parts of her body, including her back, joints, arms, and legs." In 2010, a doctor described her as having an "off and on" history over the previous ten years with Sweet's syndrome, which caused "pain in her back, arms and legs." Magnuson was also diagnosed with Hashimoto's disease and fibromyalgia and had undergone several surgeries to her lower leg for an Achilles tendon injury. Magnuson's pain, "primarily in [her] lower extremities," continued for several years. While the cause was unknown, the pain was associated with Sweet's syndrome. Following several years of increased dosages of pain medication—reaching a point where they no longer provided "relief for her chronic pain diagnosis," Magnuson's primary care physician referred her to a pain-management expert, Dr. Spencer Wells. In her initial visits with Dr. Wells, Magnuson described "low-back pain, joint pain, . . . joint swelling, leg pain, muscle cramps, muscle pain, and muscle weakness." Dr. Wells prescribed her a "new pain-medication regimen for what [Magnuson]

---

1. "In reviewing an order from the Commission, we view the facts in the light most favorable to the Commission's findings and recite them accordingly." *C.R. England v. Labor Comm'n*, 2021 UT App 108, n.1, 501 P.3d 109 (cleaned up). As such, our recitation of the facts and quotations are largely drawn from the Appeals Board's order.

described as pain over her entire body and bilateral leg pain rated at a seven" out of ten.

¶3     In May 2014, just over six months before the accident at issue in this case, Dr. Wells diagnosed Magnuson with myofascial-pain syndrome, chronic pain syndrome, and chronic fatigue syndrome. Then in November 2014, just a month before the accident, Magnuson again described pain radiating "throughout her entire body," which "did not vary with the time of day." She described her leg pain as eight out of ten and as ten out of ten while working.

*Accident and Post-accident Work*

¶4     In December 2014, Magnuson was working as a store manager for Stage Department Store (Stage). In mid-December, she was in the back of the store receiving freight and sorting boxes. As she stepped off a pallet that was "six to eight inches" high, her right foot caught on some plastic wrap. Magnuson "fell backwards onto a metal clothing rack before landing on the concrete floor." As she fell, her back "struck the leg of the clothing rack," her "left buttock" hit one of the rack's wheels, and her right arm "got caught on the rack." Magnuson immediately felt pain in her back and lay "prone on the floor for about 15 minutes" before rolling onto her side and crawling down the hall to the break room, where another employee eventually helped her to a chair.

¶5     This accident occurred on the weekend and early the following week, an injury report was completed, and Magnuson returned to work. Until about May 25, 2015, she worked "light duty," before stopping entirely and receiving "paid temporary benefits" until June 1, 2015.

*Post-accident Medical Care*

¶6     Below we recount the medical care and evaluations Magnuson received following the accident.

¶7 **Dr. Brooks.** A few days after the accident, Magnuson sought treatment from Dr. David Brooks for "pain in her right arm and low back." She was diagnosed with "contusions on her right arm and left buttock." Dr. Brooks released Magnuson to "light-duty work." Later that month at a follow-up appointment, Magnuson reported her pain as nine out of ten, with "low-back pain radiating to her left leg," while the pain in her right arm was improving and the contusion discolorations were fading. She again received a "light-duty" work release and was prescribed physical therapy. In January 2015, she was "diagnosed with a coccyx sprain."

¶8 **Dr. Allen.** Also in January 2015, Magnuson saw Dr. Lex Allen for "low-back symptoms." An MRI revealed "severe facet degeneration bilaterally" and "moderate . . . spinal canal narrowing" in portions of her spine. Dr. Allen noted tenderness in Magnuson's hips and administered injections, which were unsuccessful in providing her relief.

¶9 **Dr. Wells.** Magnuson continued to receive treatment from Dr. Wells, the pain management physician she saw before her fall. In February 2015, she saw him for "low-back and bilateral leg pain." Dr. Wells diagnosed her with—among other things—low-back pain, lumbar spinal stenosis, and Sweet's syndrome. Magnuson received steroid injections in her lumbar spine, which again did not provide relief. Dr. Wells increased the dosage of her pain medication. At another visit in April 2015, Magnuson said that her pain had worsened. Dr. Wells recommended she get a surgery consultation.[2] Dr. Wells also recommended a further increase in her pain medication dosage, a new medication, and pool therapy. In January 2016, Dr. Wells noted that Magnuson did not respond well to the new medication or the pool therapy and

---

2. Magnuson received two surgical consultations, neither of which resulted in a recommendation of surgery as treatment.

that she rated her low-back pain at eight out of ten. He opined that she "could not work in her condition."

¶10   **Dr. Callahan (Stage Medical Consultant).** In July 2015, Magnuson was examined by Dr. Michael Callahan at the request of Stage. He diagnosed her with, among other things, a "possible" bone contusion or fracture "hidden from x-rays." Dr. Callahan noted that Magnuson's "complaints of ongoing low-back pain radiating into her left leg had not improved as expected." He concluded that the pain was "medically caused by a direct blow to her lumbosacral area on the date of the accident." He determined that she was "not medically stable" due to the work injury.

¶11   **Dr. Vroenen.** In January 2016, after Dr. Wells's note about pool therapy, Magnuson saw Dr. Diane Vroenen, who noted that "most of . . . Magnuson's pain symptoms were localized to the sacral area." Dr. Vroenen prescribed steroid patches, which successfully helped with pain control. She also recommended physical therapy, which Magnuson attended. Magnuson was prescribed medication for chronic arthritis and muscle pain. Dr. Vroenen did not opine on the medical cause of Magnuson's pain but opined that Magnuson had "reached maximum medical improvement in a treatment note dated March 31, 2016."

¶12   **PA Torgerson.** In April 2016, Magnuson attended an annual checkup with Karl Torgerson, a physician assistant. Torgerson described Magnuson as "doing much better compared to a year prior" and noted that Magnuson "was pleased with the pain-management care" she received from Dr. Vroenen. He additionally noted that Magnuson felt "her pain was well tolerated and that she could walk without difficulty, but still had pain while sitting." There was no mention of low-back pain in the notes from this appointment. In a July 2016 follow-up visit, Magnuson mentioned difficulty walking because of back pain. And in November 2016, there was a note of low-back pain and a prescription for pain medication.

¶13    **Dr. Fotheringham (Stage Medical Consultant).** In June 2016, Dr. Bart Fotheringham evaluated Magnuson at the request of Stage. He recommended she stop using narcotic pain medication. He opined that muscle relaxers and non-steroidal anti-inflammatory medications were a better alternative. Dr. Fotheringham concluded that Magnuson "qualified for a 5% whole-person impairment rating due to her work injury." However, he noted that "he was not aware of the entirety of . . . Magnuson's prior history or conditions that would warrant apportionment of the rating."

¶14    **Dr. West.** In August 2017, Magnuson visited Dr. Kristoffer West for low-back and hip pain. In addition to other diagnoses, he diagnosed her with chronic low-back and leg pain. Dr. West recommended a spinal-cord stimulator trial.

¶15    **Dr. Workman.** Dr. Ryan Workman, a physician in Dr. Wells's office, also recommended the spinal-cord stimulator trial. He placed the stimulator in Magnuson in January 2018. "Magnuson reported pain relief at a rate of 60%." The stimulator was permanently placed in March 2018, with Magnuson receiving continued follow-up appointments for adjustments to the stimulator with Dr. Workman. In May 2018, Magnuson still rated her pain as eight out of ten.

¶16    For several years, Magnuson received pain-management care, including steroid injections, narcotic prescriptions, a lidocaine infusion, and a ketorolac injection. While Magnuson experienced a "varying level of relief from the injections," neither those nor the physical therapy provided "lasting relief." And her reported pain level remained at eight out of ten.

¶17    **Dr. Theiler (Stage Medical Consultant).** Dr. Anthony Theiler evaluated Magnuson on behalf of Stage in November 2017 and again in April 2021. After the later evaluation, he opined that Magnuson's work accident medically caused "only a gluteal contusion that had resolved." He further concluded that

Magnuson sustained no permanent impairment due to the accident and, thus, no ongoing medical care was necessary for the injury. Dr. Theiler explained, "Magnuson's pre-existing conditions, including degenerative disc disease in her lumbar spine, warranted a 5% whole-person impairment rating on a non-industrial basis, but the work accident did not contribute to or aggravate such conditions." He noted that "Magnuson's medical records showed that she maintained an elevated level of pain complaints leading up to the accident and continuing long after . . . with no significant improvement of symptoms with any of the various treatments or interventions she underwent."

¶18 **Drs. Hicken.** In September 2021, Magnuson met with Dr. Gregory Hicken, an orthopedic surgeon, and Dr. Jeffrey Hicken, a chiropractor, for "a permanent impairment rating evaluation." The report listed her pain as a level eight to nine out of ten, with low-back pain and swelling and numbness in her feet. The doctors' report stated that her MRI results from 2015 to 2017 "showed worsening of spinal stenosis with greater neuroforaminal narrowing in her lumbar spine." The report concluded that Magnuson "qualified for a 17% whole-person impairment rating without apportionment for her work injury based on her persistent low-back symptoms." The report emphasized that the doctors reviewed "more than 400 pages of medical records" as part of Magnuson's medical history, but the report did not mention Magnuson's chronic low-back complaints, Sweet's syndrome, or other diagnoses she had prior to the accident. The Appeals Board pointed out that the report instead relied on Magnuson's denial of "'any prior work-related or significant low back injury . . . ' as the basis for attributing the entire impairment rating to work-related factors."

*Procedural History*

¶19 In December 2020, Magnuson filed an application for hearing with the Utah Labor Commission (Commission). She alleged that the work accident caused injury to her spine, left hip,

sacrum, and buttocks, which caused back and hip pain that had not "improved or subsided" despite treatment. Magnuson sought permanent total disability compensation, temporary total disability compensation until medical stability, or permanent partial disability compensation.

¶20 In October 2021, the case proceeded to a hearing before an ALJ. The ALJ issued an interim order and referred the case to a medical panel (Panel) for consideration in accordance with the applicable provision of the Utah Administrative Code. *See* Utah Admin. Code R602-2-2.

¶21 The Panel consisted of two medical doctors—an orthopedic surgeon and a family medicine practitioner. The Panel "carefully reviewed" all of Magnuson's medical records from both before and after the accident, interviewed and examined Magnuson, and relied on the ALJ's findings of fact from the interim order. The Panel concluded in its report that as a result of the accident, Magnuson (1) "sustained contusions to her right arm and left buttock, including a hematoma," and (2) was "noted to have sacral tenderness and a possible fracture . . . evidenced by tenderness . . . and localized swelling . . . that expectantly resolved over the following few weeks." When asked whether the accident lit up, combined with, contributed to, accelerated, prolonged, worsened, or made symptomatic a preexisting condition, the Panel concluded that Magnuson had a "preexisting condition of musculoskeletal/joint inflammation associated with Sweet's syndrome that was causing . . . lower extremity and back pain" and had been receiving ongoing treatment for four years prior to the industrial incident. The Panel also highlighted that examinations after her work injury revealed "degenerative disc and facet changes in the lumbosacral areas," which would "certainly have predated her industrial mishap." The report also noted that Magnuson received "extensive" treatment of leg, thigh, and back pain before the accident in an effort to relieve "chronic inflammatory joint pain." The Panel concluded,

It is difficult to interpret which joint pain was suffered because of chronic inflammation and which pain was superimposed by her industrial accident. As her pain intensity was at level 8/10 in November 2014 prior to her injury, and was requiring additional pain medication, it becomes very difficult to differentiate it from the claimed 8/10 level of pain afterwards, following the 2014 accident.

. . . .

[T]he problems caused by the industrial accident: right arm contusion, left superior buttock contusion, and sacral contusion, combined with her previous inflammatory problem of the back and lower extremities to cause a constellation of symptoms including, low back pain, . . . sacral swelling, . . . and lumbar pain . . . . The manifestation of the problems caused by the industrial accident was left thigh and hip pain and right arm pain, mild sacral pain which were temporary. No sacral fracture was identified and these problems resolved as expected in up to three months. The remaining complaints, problems, and treatments have been caused by her chronic inflammatory condition.

The Panel determined that Magnuson became medically stable, or in other words had reached maximum medical improvement, by March 31, 2014. Magnuson filed two objections to the Panel's report, requesting (1) that the Panel clarify how it separated injuries and conditions related to the accident from those that were preexisting and (2) that the Panel "be directed to disregard" the medical reports from Dr. Theiler due to alleged errors they contained and then issue a new report because the Panel may have been "improperly influenced" by Dr. Theiler's report.

¶22   In April 2022, the ALJ issued her final order and denied Magnuson's objections. The ALJ first determined that the Panel "relied on objective evidence and clearly set[] out its opinions." Therefore, there was no ambiguity in the report in need of correction. Second, she concluded that there was no basis to strike Dr. Theiler's report. The ALJ determined that Magnuson established medical causation for the "left thigh, hip, right arm, and mild sacral pain" she suffered from the accident and that she reached medical stability from these conditions on March 31, 2015. The order dismissed outright Magnuson's claims for permanent partial and total disability compensation as the ALJ found there were no permanent injuries or functional restrictions as a result of the accident. The ALJ also dismissed Magnuson's claim for temporary total disability because Magnuson worked through May 26, 2015, and reached medical stability on March 31 of that same year.

¶23   Magnuson challenged the ALJ's order and asked the Appeals Board to review the denial. The Appeals Board issued an order modifying the ALJ's decision. The order upheld the ALJ's decision except for extending the date of medical stability, or "maximum medical improvement," to March 31, 2016—a year later than the ALJ's determination. The Appeals Board reasoned that the evidence showed a "discrete change in . . . Magnuson's condition following" the treatment she received from Dr. Vroenen, at which point Dr. Vroenen pronounced Magnuson to reach maximum improvement on March 31, 2016. The Appeals Board found this evidence was "a more compelling indicator of medical stability." Magnuson once again raised critiques of the Panel's conclusions, particularly any reliance on Dr. Theiler's opinion and the use of the term "independent medical evaluation" by Stage's hired medical examiners. The Appeals Board determined these critiques were "unavailing" and dismissed them. Due to the change in date of medical stability, the Appeals Board determined that Magnuson was entitled to temporary total disability from June 1, 2015, to March 31, 2016.

¶24 Stage petitions for judicial review, and Magnuson cross petitions for judicial review.

ISSUES AND STANDARDS OF REVIEW

¶25 Stage argues that the Appeals Board erred in setting aside the ALJ's determination that Magnuson reached medical stability by March 31, 2015.[3] The Appeals Board's finding on medical stability is a factual determination, *Waste Mgmt. & Indem. Ins. of N. Am. v. Labor Comm'n*, 2012 UT App 339, ¶ 5, 293 P.3d 384, which

---

3. In this proceeding for judicial review, Stage also argues that the Appeals Board erred by ordering benefits to Magnuson without crediting Stage for any benefits it may have already paid to Magnuson, thus resulting in her receiving a double benefit. Magnuson concedes that "to the extent the Appeals Board's order required duplicate payment of . . . benefits it should be set aside." We do not believe it is necessary for our court to address this issue, as it can still be fully resolved between the parties in further administrative proceedings. The Appeals Board's order states that Stage is to "pay temporary total disability compensation to . . . Magnuson for the period of June 1, 2015, to March 31, 2016, a period of 43.43 weeks, at a rate of $390 per week for a total of $16,937.70." There is still plenty of room within the order for Stage to, for example, subtract any amount that has already been paid from the required total when complying with the order. Therefore, if the order does in fact require Stage to pay double benefits, the Appeals Board may address that issue how it sees fit.

We note that on the facts of the record, it does not appear that there will even be an issue of double payments. The Appeals Board found that Stage paid Magnuson "temporary benefits" until June 1, 2015. The order requires payment of benefits starting on June 1, 2015, which would not create any overlap in benefit payments. If the date from the court's findings is incorrect, Stage should have addressed that mistake in its briefing, which it did not do.

we will only disturb "if it is not supported by substantial evidence when viewed in light of the whole record," *Zepeda v. Labor Comm'n*, 2021 UT App 140, ¶ 20, 504 P.3d 712 (cleaned up).

¶26 Magnuson raises several issues in her cross-petition for judicial review. First, she asserts that the Appeals Board applied the incorrect legal standard for medical causation. "Whether the Commission has applied the correct legal standard in reaching its medical causation finding is a legal question, which we review for correctness." *Cox v. Labor Comm'n*, 2017 UT App 175, ¶ 12, 405 P.3d 863 (cleaned up).

¶27 Second, she asserts that the Appeals Board's determination that the accident did not in any way aggravate, worsen, or accelerate Magnuson's preexisting conditions is not supported by substantial evidence. "[A] challenge to an administrative agency's finding of fact is reviewed for substantial evidence." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242.

¶28 Third, she asserts that the Appeals Board erred when it denied Magnuson's objection and did not instruct the Panel that Stage's medical examiners were not independent. We review such decisions "under an abuse of discretion standard, providing relief only if a reasonable basis for that decision is not apparent from the record." *Bade-Brown v. Labor Comm'n*, 2016 UT App 65, ¶ 8, 372 P.3d 44 (cleaned up).[4]

---

4. As Stage points out, Magnuson's briefs did not abide by our rules of appellate procedure, which require the party to provide a citation to the record for each issue "showing that the issue was preserved for review . . . or a statement of grounds for seeking review of an issue not preserved." Utah R. App. P. 24(a)(5)(B); *see also id.* R. 24A(c). Furthermore, Magnuson makes no effort in her reply brief to address this issue, even when identified and highlighted by Stage. Magnuson's failure is grounds enough for

(continued…)

ANALYSIS

I. Date of Medical Stability

¶29    As discussed, we will overturn a factual determination of the Appeals Board only where no substantial evidence exists to support the decision. *See Zepeda v. Labor Comm'n*, 2021 UT App 140, ¶ 20, 504 P.3d 712. This is a relatively high bar for an appellant to meet. While "substantial evidence is more than a mere scintilla of evidence," it is still "something less than the weight of the evidence." *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 14, 317 P.3d 464 (cleaned up). A decision by the Appeals Board "meets the substantial evidence test when a reasonable mind might accept as adequate the evidence supporting the decision." *Id.* (cleaned up).

¶30    Stage and Magnuson each argue that the Appeals Board's decision was not supported by substantial evidence. Stage argues that the evidence supports the earlier 2015 date recommended by the Panel and adopted by the ALJ. Magnuson argues that the Appeals Board "ignored" evidence supporting a "longer period of medical instability and a greater permanent impairment rating." To support their arguments, the parties each outline in their briefing significant variations in the evidence and medical reports. We acknowledge that there is evidence on both sides of this issue—but that fact does not necessitate reversal. *See Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 30, 378 P.3d 1273 ("We will not reweigh the evidence and independently choose which inferences we find to be most reasonable; rather, we defer to the Commission's findings when reasonably conflicting views arise, as it is the Commission's province to draw the inferences and resolve these conflicts." (cleaned up)). All that is required here is substantial evidence that "a reasonable mind might accept as adequate the evidence supporting the decision." *Id.* (cleaned

---

us to dismiss her second and third claims as unpreserved; nevertheless, we will address the claims on the merits as at least some aspects of them do appear to be preserved.

up). That does not mean that the decision must be the only possible conclusion someone could reach based on the evidence—rather, it means only that the decision must be a reasonable one. In some cases, there may be more than one possible reasonable conclusion supported by the evidence.

¶31 We conclude—just as the Appeals Board did—that a reasonable mind very well might accept as adequate the evidence supporting a change to the date of medical stability. In its order, the Appeals Board extended the date of medical stability in the ALJ's order from March 31, 2015, to March 31, 2016. The ALJ had relied on the recommendation of the Panel when it concluded that the 2015 date was appropriate. In contrast, the Appeals Board determined that "other medical evidence [was] more persuasive than the [Panel's] opinion." The Appeals Board reasoned that Dr. Vroenen's report in Magnuson's medical record showed "a discrete change" in her condition after undergoing Dr. Vroenen's targeted treatments of her sacral symptoms. These treatments included steroid patches that provided "excellent pain control." Dr. Vroenen concluded that Magnuson "reached maximum improvement in a treatment note dated March 31, 2016." The Appeals Board found this evidence was "a more compelling indicator of medical stability" than the Panel's "general expectation for the condition to have resolved within three months of the injury without specific medical evidence to support such date." When looking at Magnuson's medical record, this conclusion is one that a reasonable person very well may determine is adequately supported. Thus, because the Appeals Board's decision to modify the date of medical stability was a reasonable conclusion supported by substantial evidence, we will not disturb it.

## II. Applicable Legal Standard for Medical Causation

¶32 Under the Utah Workers' Compensation Act, an employee injured "by accident arising out of and in the course of the employee's employment" is entitled to "compensation for loss

sustained on account of the injury." Utah Code § 34A-2-401(1). "We have recognized that this statute creates two prerequisites for a finding of a compensable injury. First, the injury must be 'by accident.' Second, the language 'arising out of and in the course of employment' requires . . . a causal connection between the injury and the employment." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 44, 308 P.3d 461 (cleaned up) (quoting Utah Code § 34A-2-401(1)). The first prerequisite is not at issue here, so we turn directly to the second.

¶33 To establish the required causal connection, a party must show that the workplace's "conditions or activities . . . were both the medical cause and the legal cause of [the] injury." *Id.* ¶ 45. The issue raised by Magnuson concerns only the medical cause of her injury.

¶34 Magnuson argues that the Appeals Board applied the incorrect legal standard to its medical causation analysis. She contends that the Appeals Board should have applied the two-part test for medical causation laid out in *Cox v. Labor Commission*, 2017 UT App 175, 405 P.3d 863. To recover under *Cox*, the claimant must show that

> (1) the industrial accident contributed in any degree to the claimant's condition, such as by aggravating a preexisting condition, and (2) the aggravation is permanent, i.e., the claimant's medical condition never returned to baseline, meaning the claimant's condition immediately before the accident.

*Id.* ¶ 20. However, in *Morris v. Labor Commission*, 2021 UT App 131, 503 P.3d 519, our court clarified that health issues and developments which prevent a claimant from returning to baseline but are exclusively the result of a preexisting condition rather than industrial factors do not entitle the claimant to recovery. *Id.* ¶ 21.

¶35    Magnuson misconstrues the Appeals Board's analysis. The Appeals Board did in fact explicitly lay out both the test from *Cox* and the clarification from *Morris*. It then correctly applied both these legal standards to Magnuson's case—though it admittedly could have done so a bit more clearly. The Appeals Board determined "the medical evidence show[ed] that [Magnuson] was experiencing significant and chronic pain for years leading up to the 2014 work accident and that she continued to experience the same symptoms for several years after the accident." The Appeals Board rejected Magnuson's theory that the "effects of the work injury combined with her pre-existing condition such that her subsequent complaints" were related to the accident. After "carefully" reviewing the Panel's reasoning, the Appeals Board concluded that Magnuson's current condition was "separate from her work injuries and not causally connected to the work accident." Thus, although it did not explicitly say so, the Appeals Board determined that Magnuson did not satisfy the first step of *Cox* as her current condition was due to her preexisting conditions rather than work-related injuries. Magnuson even concedes in her brief that the Appeals Board concluded "that the work accident medically caused acute contusions to . . . Magnuson's right arm, back, left buttock, and sacrum, which returned to their baseline status."[5] These injuries are the only injuries that the Appeals Board determined were a result of the accident and are—as determined by the Panel and adopted by the Appeals Board—all unrelated to her preexisting conditions. Magnuson further

_____

5. We acknowledge that the Appeals Board confusingly used the phrase "returned to their baseline" when it did not need to move to step two of the *Cox* analysis. However, when viewed in the context of the Appeals Board's order, it is clear it was discussing an acute injury rather than aggravation of a preexisting condition. Furthermore, even if this were a discussion of a preexisting condition, the Appeals Board determined that the condition had returned to baseline, which would satisfy the second step of *Cox*; thus, Magnuson's claim would still fail.

concedes this point when she states in her brief, "The Appeals Board found that the industrial accident in no way caused any degree of worsening or progression of . . . Magnuson's pre-existing condition."

¶36    Magnuson argues that this conclusion conflicts with the Appeals Board's adoption of the Panel's statement that these injuries "combined" with her preexisting conditions "to cause a constellation of symptoms." But this statement from the Panel was a global one explaining that Magnuson had a "constellation" or myriad of health conditions, which is not the same as saying that the preexisting conditions were aggravated or worsened by the accident. While the panel inventoried her chronic conditions, it specifically opined that the only "manifestation of the problems caused by the industrial accident was left thigh and hip pain and right arm pain, mild sacral pain," all of which it explained were "temporary."

¶37    Accordingly, we reject Magnuson's assertion that the Appeals Board applied the wrong standard.

### III. Preexisting Conditions

¶38    Magnuson next argues that even if the Appeals Board "adequately addressed the medical causation requirements," substantial evidence does not support the "factual determination that . . . Magnuson's pre-existing conditions were not aggravated or worsened to any degree under the first step of *Cox*." *See Cox v. Labor Comm'n*, 2017 UT App 175, ¶ 20, 405 P.3d 863. As we have noted, the Appeals Board's factual determinations are given a high level of deference because the substantial evidence test is met "when a reasonable mind might accept as adequate the evidence supporting the decision." *Cook v. Labor Comm'n*, 2013 UT App 286, ¶ 14, 317 P.3d 464 (cleaned up). Our court will not "reweigh the evidence and independently choose which inferences we find to be most reasonable; rather, we defer to the Commission's findings when reasonably conflicting views arise." *Hutchings v. Labor*

*Comm'n*, 2016 UT App 160, ¶ 30, 378 P.3d 1273 (cleaned up). Magnuson's argument fails as there are no grounds to overturn the strong deference given to the Appeals Board's factual determination.

¶39   Magnuson argues that the Appeals Board relied entirely on the Panel's report but that the report does not support a conclusion that the "accident in no way caused any degree of worsening or progression" of her preexisting conditions. To support this contention, Magnuson misquotes the Panel's response to this question: did the accident "light up, combine with, contribute to, accelerate, prolong, worsen, or make symptomatic a preexisting condition to any degree?" Among other errors, Magnuson adds the adverb "very" to the Panel's answer that it "is difficult to interpret which joint pain was suffered because of chronic inflammation and which pain was superimposed by [Magnuson's] industrial accident." The Panel continued that because Magnuson's "pain intensity was at a level 8/10 in November 2014 prior to her injury, and was requiring additional pain medication, it becomes very difficult to differentiate it from the claimed 8/10 level of pain afterwards, following the 2014 accident." Magnuson argues that the Panel noted both that at her first examination post-accident she claimed her "low back hurt the most" and that the pain continued while her other symptoms, i.e., the contusions, resolved. Magnuson contends that the Panel provided no information as to whether it was able to differentiate Magnuson's post-accident and preexisting conditions nor what the cause was of what it interpreted as the progression of her preexisting conditions.

¶40   But this is not an accurate characterization of the Panel's report. The Panel did in fact explain how it differentiated between Magnuson's conditions. The Panel reasoned that the "fact that her pain, though somewhat migratory, has been persistent, and is unrelenting, supports progression of her chronic inflammatory disorder, Sweet's syndrome, as the proximate cause of her persistent pain and functional complaints." The Panel

emphasized that Magnuson had "suffered similar problems for four years prior" to the accident and that after the injury, she had received treatments for ailments such as sacroiliitis, "lumbar radiculopathy, . . . hip pain and generally inflammation" and had "never reduced her pain below level 8/10, the level of chronic inflammatory pain prior to injury." These symptoms are separate and apart from the contusions the Panel clearly marked as the only injuries resulting from the work accident. Furthermore, the Appeals Board's reliance on the Panel's report does not require the Panel to determine the cause of any progression in her preexisting conditions, only that the progression was not a result of the accident. Even if there is conflicting evidence here, which we are not convinced there is, we do not reweigh the evidence but defer to the Appeals Board's findings, which appropriately relied on the Panel's report. *See id.*

¶41 To further her argument that the Appeals Board erred, Magnuson attempts at length to educate us on the definition of and symptoms associated with Sweet's syndrome.[6] Magnuson claims that the Panel's conclusion that her current symptoms and limitations are a result of Sweet's syndrome is further evidence of the unreliability of the report because the disease's symptoms manifest differently than described by the Panel. Magnuson took

---

6. Magnuson appears to also argue that the Panel members were unqualified to opine on the role Sweet's syndrome played in Magnuson's health. Magnuson contends that because neither of the two Panel members specialized in dermatology or had related experience, they were unqualified to offer opinions on the effect Sweet's syndrome had on Magnuson's health. Magnuson provides us with no record citation where she raised this issue below. Objection to a medical panel's report, including a complaint against their competency, must be made within 20 days of the report being served on the parties. Utah Adim. Code R602-2-2(B). This argument is therefore unpreserved, and we will not address it further.

a similar approach with the Appeals Board. The Appeals Board correctly noted that the information Magnuson provided was of "little evidentiary value," and the Appeals Board instead relied on the Panel's explanation supported by the treatment notes of numerous treating physicians and examiners—including those Magnuson hired. Moreover, the medical information Magnuson provided and opined on in her brief is inappropriate for this court to consider because she provided it through briefing by her counsel rather than through the medical reporters provided to the Appeals Board. *Cf. Hymas v. Labor Comm'n*, 2008 UT App 471, ¶ 11, 200 P.3d 218 (declining to disturb the Commission's decision to exclude lay testimony offered in support of medical causation).

¶42 Thus, Magnuson's arguments are unavailing, and her claim fails as the Appeals Board's decision is supported by substantial evidence.

IV. Denial of Magnuson's Objections

¶43 Magnuson's final argument is that the Appeals Board should have allowed her objections to Stage's medical examiners labeling themselves as "independent" and should have instructed the Panel that the reports from those examiners were not in fact independent. Magnuson took particular issue with Dr. Theiler's report.

¶44 Magnuson argues that her objection should have been sustained because, under rule 35 of the Utah Rules of Civil Procedure, use of the phrase "independent medical examiner" (IME) is discouraged. *See* Utah R. Civ. P. 35 advisory committee's note to 2017 amendment ("The parties and the trial court should refrain from the use of the phrase 'independent medical examiner,' using instead the neutral appellation 'medical examiner,' 'Rule 35 examiner,' or the like."). Magnuson contends that because the Commission has no specific rules regarding this issue, rule 35 applies. She cites *Barker v. Labor Commission*, 2023 UT App 31, 528 P.3d 1260, *cert. denied*, 534 P.3d 751 (Utah 2023), to

support this conclusion. *Id.* ¶ 11 (holding that rule 35's recording provision applied because it was not in conflict with the Commission's rules, which are silent on the issue). However, this reasoning does not compel a change in the result here.

¶45 Magnuson is correct that an IME is far from independent due to the conflict of interest arising between the medical examiners and the insurance companies paying their bills. However, in the context of Commission cases, as recognized by Utah caselaw, this is a very common term—one any member of an experienced medical panel would be familiar with and understand the complexities of. Our supreme court has explained that "the purpose of an IME, in the workers' compensation setting, is to provide the carrier, and potentially the relevant fact finder, with independent information on the claimant's injuries." *Kirk v. Anderson*, 2021 UT 41, ¶ 13, 496 P.3d 66. The court continued that IMEs "play a vital role in the overall administration of health care benefits and workers' compensation benefits" as IMEs offer "an unbiased opinion assessing specifically whether the patient's work-related injury requires treatment, while the injured person's own health care provider is able to administer care without influence by insurance companies." *Id.* ¶ 23. Through IMEs, "patients enjoy unbiased care while the insurance companies still benefit from the opinions of medical professionals." *Id.*[7]

---

7. Magnuson argues that this language from *Kirk v. Anderson*, 2021 UT 41, 496 P.3d 66, in fact supports her argument as the case addressed whether a physician-patient relationship existed between an IME and the examined worker. *Id.* ¶ 10. The court concluded that to "impose a categorical duty of care running from the independent medical examiner to the subject would put the examiner in an untenable position, if not create an outright conflict of interest" due to the independent medical examiner's contractual relationship with the employer or insurer. *Id.* ¶ 25.

(continued…)

¶46 In denying Magnuson's objection, the Appeals Board correctly pointed to the fact that while these IMEs were completed on behalf of Stage and were "therefore not independent," "this misnomer is well-recognized in the workers' compensation setting." We agree with the Appeals Board's reasoning that "there is no indication that the veteran members of the [Panel] were confused" by the use of the label "independent." The difference between Magnuson's treating and consulting physicians and those retained by Stage "was clear from the records" the Panel reviewed. Magnuson attempts in her reply brief to point us to evidence in the record supporting the Panel's alleged confusion over the role of Stage's medical examiners. But we find this evidence both unconvincing and inappropriately raised for the first time in her reply brief.

---

Magnuson argues that this reasoning—the conflict of interest—is exactly why Dr. Theiler and others hired by Stage were incorrectly labeled as "independent." However, the court's reasoning in *Kirk* continues that it can "safely say that an independent medical examiner who has otherwise conducted an [examination] in good faith and has met their standard of care has fulfilled their duty, regardless of whether the results were favorable to the insurer or to the . . . subject." *Id.* Thus, in meeting the standard of care, the independent medical examiner must reach a conclusion regardless of, or in other words, independent of, which party those results favor. We therefore see *Kirk* as helpful and applicable in making our determination that the Appeals Board correctly overruled Magnuson's objection to use of the word "independent." Furthermore, to the extent that true independence is impossible due to this conflict of interest, use of the term IME is one which members of a medical panel would be well-versed in. This term would not cause confusion for seasoned panel members familiar with the nature of such examinations.

¶47　Thus, the Appeals Board did not abuse its discretion when it denied Magnuson's objections.[8]

CONCLUSION

¶48　For the foregoing reasons, we conclude that the Appeals Board's order modifying the ALJ's decision was sound and the Appeals Board did not abuse its discretion by denying Magnuson's objections. We, therefore, decline to disturb the Appeals Board's order.

––––––––––

8. Still, we recognize that the reasons that the advisory committee gave for moving away from identifying adverse medical exams as independent, *see* Utah R. Civ. P. 35 advisory committee's note to 2017 amendment, may also be relevant here, although the chance of prejudice is far more removed in a proceeding before an ALJ or the Commission than it would be before a jury. The Commission might be well-served to adopt a rule using different nomenclature for such exams.